# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

—————————————————————————— :
:
:
MARIA VICTORIA PEREZ and KAELA R.M. :
BROWN, individually and on behalf of all others :
similarly situated, :
                              Plaintiffs, :     **11-CV-1812 (JFB)(AKT)**
:
    v. :
:
ALLSTATE INSURANCE COMPANY, :
:
                           Defendant. :
:
—————————————————————————— :


## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE ACTION


ROBERT WHITMAN
rwhitman@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018
Telephone:    (212) 218-5500
Facsimile:    (212) 218-5526

*Attorneys for Defendant*
ALLSTATE INSURANCE COMPANY

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ....................................................................1

II.    RELEVANT PROCEDURAL HISTORY .....................................................2

III.    STATEMENT OF FACTS ...........................................................................3

    A.    Background ........................................................................................3

    B.    Adjusters ...........................................................................................3

        1.    Coverage Decisions .............................................................4

        2.    Deciding What Medical Expenses Will Be Reimbursed .............5

        3.    Ordering Independent Medical Examinations and Peer Reviews...............6

        4.    Determining Lost-Wage Claim Reimbursements ........................7

    C.    Variation in Day-to-Day Experiences Among Adjusters ....................7

        1.    Differences Based on Use of Claims Processors .......................7

        2.    Differences Based on Coverage Determinations ........................8

        3.    Differences Based on Securing Items for Investigations ............8

        4.    Differences Based on Practices for Challenging Peer Reviews/IMEs........8

        5.    Differences Based on Rank and Tenure......................................9

        6.    Differences Based on Hours Worked .......................................10

    D.    Variation Among Adjusters From State to State ...............................10

    E.    Variation Between the Named Plaintiffs and Other Adjusters .............12

IV.    ARGUMENT ..............................................................................................12

    A.    This Court Must Apply a Stringent Standard to Determine Whether the Members of the Collective are Similarly Situated ................................................12

    B.    The Individual Plaintiffs' Disparate Employment Circumstances Require Decertification of Their FLSA Claims ................................................14

1.      Application of the Administrative Exemption Requires Highly
        Individualized Analysis ...........................................................................14

2.      Plaintiffs Cannot Show They Are Similarly Situated Because Their
        Factual and Employment Settings Are Different.......................................16

3.      Allstate Has Plaintiff-Specific Defenses....................................................18

4.      Determination of Damages Must be Individualized ...................................20

C.      Fairness and Procedural Considerations Mandate Decertification .......................22

V.      CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aquilino v. Home Depot, U.S.A., Inc.*,
   No. 04-04100, 2011 WL 564039 (D.N.J. Feb. 15, 2011) .......................................................20

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
   772 F. Supp. 2d 1111 (N.D. Cal., 2011) ...........................................................................20, 24

*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*,
   No. 3:10-cv-592, 2011 WL 4351631 (W.D.N.C. Sept. 16, 2011)..........................................14

*Collins v. Dollar Tree Stores, Inc.*,
   788 F. Supp. 2d 1328 (N.D. Ala. 2011)................................................................................22

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013)...................................................................................................20, 21

*Cruz v. Dollar Tree Stores, Inc.*,
   Nos. 07-2050, 07-4012, 2011 WL 2682967 (N.D. Cal. July 8, 2011)...................................22

*Espenscheid v. DirectSat USA LLC*,
   705 F.3d 770 (7th Cir. 2013) ........................................................................................13, 22

*Espenscheid v. Directsat USA, LLC*,
   No. 09-cv-00625, 2011 WL 2009967 (W.D. Wis. May 23, 2011),
   *aff'd*, 705 F.3d 770 (7th Cir. 2013)........................................................................................23

*Gardner v. Western Beef Props.*,
   No. 07-2345, 2011 WL 6140518 (E.D.N.Y. Sept. 26, 2011) .................................................17

*Ginsburg v. Comcast Cable Communs. Mgmt. LLC*,
   No. C11-1959, 2013 U.S. Dist. LEXIS 55149 (W.D. Wash. Apr. 17, 2013).........................21

*Green v. Harbor Freight Tools USA, Inc.*,
   888 F. Supp. 2d 1088 (D. Kan. 2012)...................................................................................15

*Hinojos v. Home Depot, Inc.*,
   No. 2:06-CV-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ..........................................20

*Hoffman-LaRoche, Inc. v. Sperling*,
   493 U.S. 165 (1989)............................................................................................................22

*Holt v. Rite Aid Corp.*,
   333 F. Supp. 2d 1265 (M.D. Ala. 2004) ...............................................................................22

*Johnson v. Big Lots Stores, Inc.*,
      561 F. Supp. 2d 567 (E.D. La. 2008) ..............................................................23, 24

*Karlo v. Pittsburgh Glass Works, LLC*,
      880 F. Supp. 2d 629 (W.D. Pa. 2012) ....................................................................14

*Lusardi v. Xerox Corp.*,
      118 F.R.D. 351 (D.N.J. 1987) ................................................................................20

*MacGregor v. Farmers Ins. Exch.*,
      No. 2:10-CV-03088, 2011 WL 2981466 (D.S.C. July 22, 2011) ...........................14

*Morano v. Intercontinental Capital Group, Inc.*,
      No. 10 Civ. 2192, 2013 WL 474349 (S.D.N.Y. Jan. 25, 2013) .............................13

*Morano v. Intercontinental Capital Grp., Inc.*,
      No. 10 Civ. 02192, 2012 WL 2952893 (S.D.N.Y. July 17, 2012) .........................24

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
      111 F. Supp. 2d 493 (D.N.J. 2000) ........................................................................15

*Myers v. Hertz*,
      624 F.3d 537 (2d Cir. 2010), *cert. denied,* 132 S. Ct. 368 (2011) ................13, 15, 17

*Odem v. Centex Homes*,
      No. 3:08-cv-1196, 2010 WL 424216 (N.D. Tex. Feb. 4, 2010) .............................15

*Oetinger v. First Residential Mortg. Network, Inc.*,
      No. 3:06-cv-381, 2009 WL 2162963 (W.D. Ky. July 16, 2009) ............................23

*Pefanis v. Westway Diner, Inc.*,
      No. 08 Civ. 002, 2010 WL 3564426 (S.D.N.Y. Sept. 7, 2010) .............................14

*RBS Citizens, N.A. v. Ross*,
      133 S. Ct. 1722 (2013) ...........................................................................................21

*Reyes v. Texas Ezpawn, L.P.*,
      No. 6:03-cv-00128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007) ............................22

*Roach v. T.L. Cannon Corp.*,
      No. 3:10-CV-0591, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013) .......................21

*Ruggles v. Wellpoint, Inc.*,
      272 F.R.D. 320 (N.D.N.Y. 2011) ...........................................................................17

*Ruiz v. Serco, Inc.*,
      No. 10-cv-394, 2011 U.S. Dist. LEXIS 91215 (W.D. Wis. Aug. 5, 2011) ............14

*Schaefer-LaRose v. Eli Lilly & Co.*,
    679 F.3d 560 (7th Cir. 2012) ...............................................................15

*Scott v. Family Dollar Stores, Inc.*,
    No. 3:08CV540, 2012 WL 113657 (W.D.N.C. Jan. 13, 2012)................................13

*Smith v. Family Video Movie Club, Inc.*,
    No. 11-CV-1773, 2013 U.S. Dist. LEXIS 54512 (N.D. Ill. Apr. 15, 2013) ...........................21

*Spellman v. Am. Eagle Exp., Inc.*,
    No. 10-1764, 2011 WL 4014351 (E.D. Pa. July 21, 2011) ....................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011).........................................................14, 21, 22

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. May 12, 2011) ............................................13, 22

**STATUTES**

29 U.S.C. § 216(b) ..............................................................1, 2, 13, 23

Fair Labor Standards Act ("FLSA")..................................1, 2, 14, 15, 20, 21, 22, 23, 24

**OTHER AUTHORITIES**

29 C.F.R. § 541.200 ...................................................................15

29 C.F.R. § 541.700(a).................................................................19

Fed. R. Civ. P. 23(a)(2).............................................................13, 14

Fed. R. Civ. P. 23...........................................................2, 14, 15, 21, 22

Fed. R. Civ. P. 30(b)(6)............................................................2, 3, 4, 19

Pursuant to 29 U.S.C. § 216(b), Defendant Allstate Insurance Company ("Allstate") moves to decertify this conditionally certified collective action because the factual record demonstrates that Plaintiffs' misclassification claims under the Fair Labor Standards Act ("FLSA") present an array of highly individualized issues that cannot be adjudicated on a collective basis.

## I.    PRELIMINARY STATEMENT

This motion comes at the second stage of the FLSA certification process.  In contrast to the lenient standard applied at the first "conditional" certification stage, Plaintiffs now bear a significantly higher burden of proof.  They must present substantial evidence that the named Plaintiffs and all other opt-in Plaintiffs are similarly situated to each other such that a trial or other resolution of the case on a collective basis is realistic, manageable and fair.

Plaintiffs cannot do so.  The record contains different accounts of Plaintiffs' experiences as no-fault claims adjusters, including, among other things, inconsistent descriptions of their actual, day-to-day job duties, variations in the extent of the discretion they exercise and the supervision they experience, and differences in whether, when and how often they work overtime.  This inconsistency in experiences means that no single Plaintiff, nor any manageable subset of Plaintiffs, can provide testimony that is "representative" of any other Plaintiff, much less of the group as a whole.  Allstate may also assert different Plaintiff-specific defenses that cannot be litigated with common proof in a manageable mass trial, including in particular as to the two Named Plaintiffs, both of whom were terminated by Allstate for performance reasons and assert their own individual retaliation claims here.

As courts in this Circuit and elsewhere have recognized, it would be improper to allow a fact-finder to reach a one-size-fits-all verdict that binds all Plaintiffs and Allstate when, as is true here, the evidence suggests that some Plaintiffs may have viable claims but others do not.  Any

fair trial would necessitate that all or most of the valid opt-in Plaintiffs take the stand to tell their individual stories and be subject to cross-examination and Plaintiff-specific rebuttal.

Thus, this Court should decertify Plaintiffs' FLSA claims and require them to proceed individually.

## II.     RELEVANT PROCEDURAL HISTORY

On April 3, 2012, Plaintiffs moved for conditional certification pursuant to 29 U.S.C. § 216(b).  (ECF No. 32.)  Allstate chose not to oppose that motion, but reserved its right to seek decertification and to oppose class certification of Plaintiffs' New York Labor Law claims under Federal Rule of Civil Procedure 23.  (ECF No. 41.)[1]  The parties then agreed on a joint proposed notice, which this Court approved.  (ECF No. 44.)

Notices were sent to hundreds of current and former Allstate employees.  A total of 92 filed consents to "opt in," although many of those individuals have been or will be removed from the case because of their failure to participate in discovery or because they are not properly part of the putative collective and received the notice in error.

The parties engaged in extensive discovery, including depositions of management personnel, Rule 30(b)(6) designees and opt-in Plaintiffs, as well as production and exchange of hundreds of thousands of pages of documents.

---

[1] On June 14, 2013, Plaintiffs filed their motion for class certification under Rule 23.  (ECF No. 115.)  Allstate is filing its opposition to that motion concurrently with the instant motion.

## III.    STATEMENT OF FACTS[2]

### A.    Background

Allstate sells and services insurance products that provide Personal Injury Protection ("PIP") coverage, sometimes referred to as "no-fault" coverage, which reimburses eligible individuals for medical expenses and, in some cases, lost wages and other damages, arising from auto accidents.[3]  Allstate also offers Medical Payments coverage ("MedPay"), which pays reasonable and necessary medical and/or funeral expenses for an insured and others injured or killed in an auto accident while riding in or driving an insured's vehicle without regard to fault. Unlike PIP, MedPay coverage applies pursuant to the terms and conditions of an insurance policy rather than pursuant to state law and does not cover lost wages.[4]

### B.    Adjusters

PIP and MedPay claims are handled by claims adjusters with the formal titles Claims Service Adjuster, Senior Claims Service Adjuster, or Staff Claims Service Adjuster, and are referred to within Allstate as Pending Adjusters (hereinafter referred to as "Adjusters").[5] Adjusters have the primary job duties of evaluating and deciding coverage, investigating claims, and determining reimbursement amounts for injury-related treatment and lost wages arising out of auto accidents.[6]

---

[2] Deposition transcripts and certain other materials cited herein are attached to the Declaration of Robert S. Whitman ("Whitman Decl.").  Depositions are referred to by the deponent's name.

[3] Buscemi Dep. 15:2-8; 17:25-18:3; Sullivan Dep. 73:4-10; Rodriguez Dep. 36:21-25.

[4] Buscemi Dep. 15:2-8; 17:25-18:3; Sullivan Dep. 14:4-13; Rodriguez Dep. 36:21-25.

[5] Declaration of Diane Wade ¶ 3; Declaration of Laurette Turturro ¶ 3; Declaration of Gregory Witherspoon ¶ 2; Whitman Decl. Ex. P.

[6] Christine Sullivan, Allstate's Rule 30(b)(6) designee regarding job duties of Adjusters, testified that the most important part of Adjusters' jobs is "the handling and the decision making associated with the no-fault and/or the med-pay coverage for a particular accident and for a

In carrying out these responsibilities, Adjusters undertake a host of specific tasks, as discussed in more detail below.

### 1.    Coverage Decisions

Upon receiving a new claim, Adjusters must first make the threshold decision, based on the specific facts of the file, as to whether the claim is covered by the insurance policy in question.[7]

Each Adjuster must decide at the outset whether, and if so how, to investigate the facts on which his or her coverage decision is based.[8]  In making their coverage determinations, Adjusters also obtain information from third-party sources, such as police reports and medical records, pictures and other visual evidence of the accident, and interviews with other parties involved in the accident and witnesses.[9]  *Id.*

In addition, each Adjuster must review the actual terms of the insurance policy corresponding to each claim.  This ensures that the damages claimed and the claimant are

---

particular state," which involves an evaluation of "coverage investigation, whether or not coverage is applicable, what laws would apply to a particular state, depending on where the accident occurred, who was involved in the accident, [and determining the] definition of insured [under a particular policy]."  Sullivan Dep. 6:11-7:6, 13:15-14:3; *see* Whitman Decl. Ex. AA at 5-8, 11-15.

[7] Sullivan Dep. 26:19-27:7 (In determining how to handle a claim, Adjusters are responsible for "damage investigation" which involves understanding whether an injury is causally related to a particular accident and whether the treatment is appropriate); Buscemi Dep. 75:7-14 (Adjusters investigate the extent of the injuries, how much to set in reserves, whether there are policy exclusions that apply and whether there are prior injuries that are related to the current injury); *see* Whitman Decl. Ex. AA at 6-8.

[8] Sullivan Dep. 16:11-17:2 (Adjusters decide, on a case-by-case basis, whether they need to speak with the claimant to better understand how the accident caused the injury); Perez Dep. 208:7-209:14 (Perez interviewed claimants to determine whether a claim was accident related); *see* Whitman Decl. Ex. AA at  7-8.

[9] Perez Dep. 207:2-208:21 (Adjusters decide whether to review police reports or speak to claimants in determining the cause of injury); Lobello Dep. 143:8-23 (Adjusters investigate hospital records to determine claimants' alcohol level).

covered by the applicable policy.[10]   Adjusters have the authority to deny coverage on certain claims without supervisory approval, such as if the accident occurred during the course of the driver's employment and was covered by workers' compensation coverage, if the driver was intoxicated at the time of the accident or if the Adjuster determined that a pedestrian was hit by a vehicle other than an insured's.[11]

### 2.    Deciding What Medical Expenses Will Be Reimbursed

Once coverage is established, the Adjuster decides whether to pay specific bills and, if so, how much.[12]   Based on their own judgment, Adjusters determine whether to accept a claim, deny a claim, seek more information, refer a claim to a Field Adjuster to obtain more information, or refer a claim to the Special Investigations Unit if they suspect fraud.[13]   Although PIP/MedPay insurance does not require determining who caused an accident, the Adjuster must always determine whether the accident caused the claimed harm.[14]   Thus, Adjusters scrutinize each

---

[10] *See* Whitman Decl. Ex. AA at 6.

[11] Wade Decl. ¶ 8(a).

[12] Buscemi Dep. 70:8-11 (some policies have death-indemnity coverage specific to named insured or spouse, and Adjuster must analyze policy to determine whether indemnity coverage applies); Sullivan Dep. 25:6-20 (there are variations in policies that Adjusters must learn about and evaluate); *id.* 23:8-19 (Adjusters have to understand the contract to determine extent of coverage and individuals who are entitled to receive benefits); Clark Dep. 77:22-78:4 ("[A]s an Adjuster I am responsible for the medical claim from the beginning to the end."); *see* Whitman Decl. Ex. AA at p. 6.

[13] Turturro Dep. 85:2-9, 115:13-21 (Adjusters determine whether they need to obtain prior records and whether additional information will justify or clarify diagnosis on a case-by-case basis); Sullivan Dep. 32:6-33:6 (if Adjuster is confronted with two or three additional claims he was not aware of at time of initial injury, he determines whether to deny or postpone claim, order IME, or send file to SIU); *see* Whitman Decl. Ex. AA at 8, 15.

[14] *See* Whitman Decl. Ex. AA at 7.

medical bill to ensure claimants are not seeking reimbursement for medical expenses unassociated with their covered accident.[15]

### 3.   Ordering Independent Medical Examinations and Peer Reviews

In some circumstances, Adjusters may seek an independent medical examination ("IME") or "peer review" to determine whether claimed treatment was caused by a covered accident and/or was reasonably medically necessary.[16]   If a claim is denied due to a negative IME or a peer review, "the [A]djuster has reviewed and made that decision [and] they are denying the claim. [Management has] no part" in that decision, which is  "the [A]djuster's decision to make." (Buscemi Dep. 120:6-121:15.)

---

[15] Clark Dep. 17:15-19:18 (speaks with the insured and looks at the police report and the circumstances of how the injury happened to adjust and determine coverage); Wade Decl. ¶ 8(c) ("The Adjuster is required to determine whether there is a question about which treatment is properly attributable to the accident as opposed to the pre-existing condition, and if so to seek medical guidance on the issue so that the Adjuster can decide which treatment should be reimbursed."); Buscemi Dep. 77:11-23 (Adjusters evaluate pertinent information regarding prior claims, including whether person fully recovered from prior injury); Sullivan Dep. 110:13-112:6 (Adjusters can look to general or AMA guidelines regarding length and types of treatment,  but still must make independent decision because of extenuating circumstances for each individual and/or accident.); Buscemi Dep. 78:13-79:22 (Adjusters handle potential pre-existing injuries on case-by-case basis because every person, case and injury is different).

[16] Whitman Decl. Ex. Z  ("Independent Medical Examinations and Peer Reviews" at Allstate 010256) ("Decisions on matters requiring judgment or discretion, including but not limited to coverage and policy decisions, must be made by Adjusters."), Allstate 010274 (peer review should be ordered "[i]f treatment records appear to be incomplete or unclear [or] [i]f the causality of the injury or condition is questionable"), Allstate 010277 ("The Adjuster should carefully read the report of the peer review physician.")); Clark Dep. 49:2-5 (Adjusters determine whether ordering an IME is appropriate and necessary); Sneed Dep. 59:18-23 (IME requested if claimant has been treated for many months after an accident and wishes to continue treatment); Dominguez Decl. ¶¶ 4(e)-(f) (Adjuster has discretion to order IME from variety of health care professionals depending on judgment at various times during handling of claims); Sullivan Dep. 38:11-40:7 (if Adjusters have question regarding medical treatment and bills, they may decide to send file to vendor or order IME); Buscemi Dep. 138:4-21 (Adjusters determine need for and type of IME); Perez Dep. 95:7-10, 97:8-25, 98:2-15 (peer review ordered if situation did not "sit right"; she would form opinions of her own and express them to manager); *see also* Whitman Decl. Ex. AA at 11-12, 14.

### 4.    Determining Lost-Wage Claim Reimbursements

Adjusters also handle lost wage claims associated with auto accidents.  In doing so, the Adjuster must determine the extent to which a claimant is truly unable to work as well as the amount of lost wages Allstate will cover.[17]

## C.    Variation in Day-to-Day Experiences Among Adjusters

### 1.    Differences Based on Use of Claims Processors

Some Adjusters work with a Claims Processor, a non-exempt employee who generally handles the clerical aspects of claims so the Adjuster can spend more time making acceptance or denial decisions.[18]  Some Adjusters have had variations in their use of Processors over time, sometimes having one assigned to work in tandem, other times not having use of one at all.[19]

---

[17] Turturro Dep. 123:23-124:5 (Adjuster has authority to deny wage loss benefits); *id.* 119:25-120:19 (to determine lost wages, Adjusters must verify dates claimant was out of work, determine pre-existing conditions, and review medical records and treating physician's notes to ensure that reason for disability pertains to loss); Perez Dep. 92:25-94:10 (if lost wages claimant obtained note from doctor to be out of work for 30 days but later requested additional 30 days, Perez would request another doctor's note and, if additional note was "ambiguous" or "insufficient," would request a "better note" according to her standards); *id.* 95:13-17 (if claimant sprained wrist and doctor said claimant should be out of work for 30 days, "if I thought…that person could still type with a sprained wrist, then I would have it sent to…an independent doctor to see what their opinion was").

[18] Lobello Dep. 117:9-12 (once Processors make initial contact with customer, file is referred to Adjuster); Perez Dep. 103:4-7 (Processor contacts attorney or claimant and requests all necessary documents); *id.* 64:4-65:7 (Processors type up IME results, assist Adjusters, sort Adjusters' mail, and answer phones but never pay bills or issue denials); Brown Dep. 352:15-353:11 (Processor makes initial contact with claimant and then passes file to Adjuster; file automatically given to Adjuster if claimant is treated by two or more specialists, if it is an out-of-state claim or policy, or if there is "anything weird during the investigation or the processor feels that it is above his or her head"); Hlatky Dep. 100:10-21 (Processors' tasks differ from Adjusters' tasks because Processors handle overflow phone calls, faxed documents for Adjusters and clerical functions)

[19] Sneed Dep. 72:5-19 (Processor duties vary from administrative duties to paying medical bills depending on the manager); Lobello Dep. 115:20-116:11 (one processor assigned to every two Adjusters; did not always work with same processor; not all files assigned to a single processor at any given time); Perez Dep. 69:18-70:3 (did not have a processor assigned to me); Rodriguez Dep. 86:7-17 (does not have a processor assigned to any of her current claims as of February

### 2.      Differences Based on Coverage Determinations

The deposition testimony of Adjusters details variation in how they determine whether coverage exists.[20]    For example, when asked how they determine whether uninsured/underinsured bodily injury exposure exists, Kaela Brown testified that "I don't determine if a valid uninsured, under-insured bodily injury exposure exist[s]" (Brown Dep. 88:12-14), while Marcianne Lobello stated, "We had to determine what coverage uninsured, underinsured motorist coverage the injured party had" (Lobello Dep. 142:10-12).  With respect to MedPay coverage, Brown testified that "I don't review and investigate Med Pay coverage issues" (Brown Dep. 88:15-17), but Maria Perez testified that she reviewed the Med Pay policy for possible exclusions pursuant to state regulations (Perez Dep. 83:16-19).

### 3.      Differences Based on Securing Items for Investigations

Adjusters testified differently about whether and how they secure items for follow-up investigations.  Brown testified that "I do not secure needed items for investigation" (Brown Dep. 71:3-4), while Lobello testified that she secures and provides needed items in investigations such as signed statements and/or proof of payment.  (Lobello Dep. 154:22-155:13).

### 4.      Differences Based on Practices for Challenging Peer Reviews/IMEs

Lobello testified that if a peer review doctor concluded that a particular treatment was necessary despite findings that suggested to her that it was not, she would highlight this

---

2013); Sneed Dep. 69:21-70:1 (does not have a processor assigned to her but has been assigned a processor on all claims); Cherry Dep. 93:15-19 (in terms of what Processors can handle, each group does it differently within an office); Wade Decl. ¶ 7 (in Brooklyn Metro, claims files are handled by a Processor for the first 30-60 days, and turned over to an Adjuster  unless the file has been resolved.  In Buffalo, Adjusters handle the files from the start.); Rodriguez Dep. 48:22-49:11 (some processor teams make initial calls and send forms out but in other teams, adjusters handle these duties).

[20] *See* Whitman Decl. Ex. AA at 5.

discrepancy to her manager, communicate directly with the peer review doctor, and ask the doctor to re-review the file, which sometimes changed the doctor's conclusion. (Lobello Dep. 69:16-72:2).   Brown testified, in contrast, that "there is usually no interaction one on one between myself and the doctor" (*id*. 151:22-24).[21]

### 5.   Differences Based on Rank and Tenure

Even within a single office, variation exists between individuals with the title PIP/MedPay Adjuster.  Adjusters in band A are "Claims Service Adjusters," those in band B are "Senior Claims Service Adjusters," and those in band C are "Staff Claims Service Adjusters," having the most experience and tenure.[22]   As Adjusters ascend through the bands, they receive increased dollar-limit authority on which they can make claims decisions without managerial review, are assigned more complex cases, and take on special projects.[23]   The range of authorization differs for different Adjusters.  New Adjusters have authorization at approximately $15,000 while more experienced Adjusters have authority up to three times higher ($50,000).[24]

---

[21] *See also* Whitman Decl. Ex. AA at 13.

[22] *See* Whitman Decl. Ex. P.

[23] Turturro Decl. ¶¶ 4-9; Turturro Dep. 168:4-7 (amount of interaction between Adjusters and supervisors varies depending upon Adjuster's "level of expertise, tenure [and] technical comfort level"); Sullivan Dep. 65:10-66:15 (although denying coverage for something like material misrepresentation would normally be reviewed with a manager, "[i]f you have 10, 20 years of handling very complex investigations…a manager may determine you don't need approval…[t]hat's a local management call.").

[24] Turturro Decl. ¶ 5 ("The Adjusters in band A are the most junior in terms of tenure and have a relatively low amount of monetary authority for payments under no-fault insurance policies, typically $15-25,000 per claim.  In contrast, the band C Adjusters are the most senior and have authority up to $50,000 per claim.  The Adjusters in band B fall in between bands A and C."); Turturro Dep. 129:12-18 (A new Adjuster might receive $15,000 in authority with more experience, the dollar authority would increase.).

### 6.     Differences Based on Hours Worked

The deposition testimony of Adjusters shows little uniformity in the actual hours Adjusters spend working, including variations in their arrival and departure times, lunch breaks, other breaks, weekend work, and after-hours work done at home.[25]

### D.     Variation Among Adjusters From State to State

Each state has its own statutory and regulatory schemes governing the insurance industry and auto accident claims.  These variations create differences in how Adjusters undertake their primary job duties.

For example, some states offer either PIP or MedPay insurance (*e.g.*, Arkansas and North Dakota) while other states offer both (*e.g.*, Texas); some states vary in their compliance rules regarding payment of claims, timeframes by which Adjusters must respond to claims, penalties or interest components for noncompliance, and terms of policy agreements; some Adjusters abide by state-mandated regulations regarding medical treatment fees (*e.g.*, New York) while others abide by private vendor agreements with medical providers (*e.g.*, Colorado); and some Adjusters work for Allstate and follow Allstate policies while others work for companies with separate state policies that sell insurance under the Allstate umbrella.[26]

---

[25] *See* Whitman Decl. Ex. AA at 1-4.

[26] Sullivan Dep. 20:4-13 ("[T]here are different insurance regulations with respect to reviewing a bill, paying a bill, denying a bill…how long a period of time you have to investigate a certain aspect of a claim…an adjuster's responsibility is to know those things so that they could handle that claim appropriately."); *id.* 25:6-20 (Allstate is an umbrella company that sells insurance policies through other companies and there are variations in policies of those companies); *id.* 150:3-151:6 (Adjusters responsible for complying with state statutes even though states vary in timelines to pay or deny pending bills and in penalties or interest for untimeliness); *id.* 56:4-57:3 ("[D]ifferent laws and regulations…govern how adjusters are supposed to be handling claims in that particular state. [Accordingly], each state would have input into what they want their new hires to go through [and] what type of training they want.");  Cherry Dep. 121:13-17 (Texas offers MedPay and PIP insurance, Arkansas offers PIP medical coverage and the ability to

Many states require insurance claims adjusters to be licensed and take continuing education courses to keep their licenses current.[27]  In states that either do not use a fee schedule or use fee schedules that exclude certain injuries, Adjusters negotiate particular liens or charges billed by the provider.[28]  State-by-state variations also affect the extent of Adjusters' use of MDP, Allstate's bill-payment software.[29]

Depending on the states in which Adjusters work or for which they service claims, Adjusters receive varying amounts and types of training.  Some Adjusters are assigned to work on claims only from their home state while others work on claims from one or more other states.[30]

---

purchase non-medical disability coverage and North Dakota offers PIP coverage only); *id.* 108:17-109:23 (state-specific vendor agreements with medical providers are unique to Colorado where vendor agrees to charge Allstate a specific rate for services); Springer Dep. 38:7-8 (personal injury protection claims are dependent on the state); *id.* 46:9-23 (each state has its own rules about compliance regarding payment of claims, timeframes by which Adjusters need to respond to claims or let claimant know of need for additional information); *id.* 106:2-17 (in some states, claims are more likely to go to arbitration automatically if a claim is denied and, in these states, if an IME says that treatment is no longer necessary, Adjuster may still pay the bill because it will be less expensive than arbitration).

[27] Hlatky Dep. 101:17-22 (professional insurance license not required in New York); Gaston Dep. 37:9-10 (not all Adjusters are licensed); Cherry Dep. 178:15-24, 181:8-10 (renews Texas license every other year and Allstate monitors compliance with necessary credits); Clark Dep. 25:17-18 (licensed in approximately 12 states); *see also* Whitman Decl. Ex. AA at 10.

[28] Sullivan Dep. 135:13-137:13.

[29] Whitman Decl. Ex. U (Allstate 010603) (hospital facility bills are only reviewed by MDP in Florida, New York and Pennsylvania, and ambulance bills not reviewed by MDP except in Florida and Pennsylvania).

[30] Perez Dep. 107:24-108:19 (learns about other states' laws and handles out-of-state claims); Brown Dep. 64:8-67:5 (could be assigned claim for person from Connecticut who gets into accident in New York); Hlatky Dep. 54:22-55:6 (never worked on claims other than New York claims and has no idea if other states have the same fee schedules as New York); Springer Dep. 71:22-72:18 (Adjusters who are part of a regional team handle claims that originate in several states and others specialize in one particular state); *id.* 77:18-24 (some adjusters stay at one office throughout their entire career while others have moved several times and learn laws of several states); Cherry Dep. 73:9-12, 83:8-9 (has handled claims in up to seven states); *id.* 280:2-

### E. Variation Between the Named Plaintiffs and Other Adjusters

Both Named Plaintiffs, Maria Perez and Kaela Brown, worked solely in the Islandia, New York office and testified they had no personal knowledge of how Adjusters worked in the other New York offices.[31]   Neither is currently employed by Allstate.  Perez was terminated in June 2011 after receiving "unacceptable" ratings in her annual 2009 and 2010 performance reviews,[32] and an Unacceptable Performance Notification in December 2010 for failing to meet established Adjuster goals in multiple areas.[33]   Perez was the *only* Adjuster in her unit performing below the goals in so many areas.[34]

Similarly, Brown was terminated in June 2013 for unacceptable performance.[35]   In addition, Brown's 2011 annual review recorded a pattern of inconsistent and unacceptable performance,[36] and she received multiple notifications that her performance results were among the worst in her unit.[37]

## IV. ARGUMENT

### A. This Court Must Apply a Stringent Standard to Determine Whether the Members of the Collective are Similarly Situated

---

12 (all adjusters in Houston office can work on claims coming from multiple states and have been provided guidelines to handle claims from multiple states); Clark Dep. 22:16-17 (handles claims that occur in Colorado)*; see also* Whitman Decl. Ex. AA at 9.

[31] Brown Dep. 312:12-315:18 (never worked in Buffalo or Brooklyn office, never visited Buffalo office and only interacted with Adjusters in Buffalo "if they are transferring a call to me"); Perez Dep. 216:14-220:10 (never visited or spent time watching Adjusters in Buffalo or Brooklyn).

[32] Perez Dep. 193:15-18; Whitman Decl. Exs. W and Y.

[33] Whitman Decl. Ex. X.

[34] Musachio Dep. 55:7-18; 64:11-19, 87:10-13; Whitman Decl. Ex. V (comparing Adjusters in unit during UPN).

[35] Turturro Decl. ¶ 11.

[36] Whitman Decl. Ex. Q.

[37] Whitman Decl. Exs. R and S.

Although Allstate is bringing the instant motion, the burden falls on Plaintiffs to show that they are similarly situated to a degree sufficient to justify a collective trial. *See Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. May 12, 2011) (at decertification stage, plaintiffs continue to bear the burden of showing that class members are similarly situated). Unlike the first stage of the certification process, where Plaintiffs needed only a "colorable basis" that they are similarly situated, the court at the second stage must rigorously examine a variety of factors, including "(i) disparate factual and employment settings of the individual plaintiffs; (ii) defenses available to the defendants which appear to be individual to each plaintiff; and (iii) fairness and procedural considerations counseling for or against collective action treatment." *Id.* at 460. "At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted-in are in fact 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Myers v. Hertz,* 624 F.3d 537, 555 (2d Cir. 2010), *cert. denied,* 132 S. Ct. 368 (2011).

This inquiry is "more stringent" than is applied at conditional certification. *Zivali*, 784 F. Supp. 2d at 460; *Morano v. Intercontinental Capital Group, Inc.*, No. 10 Civ. 2192, 2013 WL 474349, at *2 (S.D.N.Y. Jan. 25, 2013). It is also substantively identical to the "commonality" inquiry under Fed.R.Civ.P. 23(a)(2). *See Espenscheid v. DirectSat USA LLC*, 705 F.3d 770, 771 (7th Cir. 2013) ("despite the difference between a collective action and a class action . . . there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards"); *Scott v. Family Dollar Stores, Inc.*, No. 3:08CV540, 2012 WL 113657, at *4 (W.D.N.C. Jan. 13, 2012) (standard under FLSA

§ 216(b) and Rule 23(a)(2) are "nearly identical"). In order to establish "commonality," a district court must conduct a "rigorous analysis" of whether the plaintiffs' claims "in fact" depend on a "common contention" of "such a nature that . . . determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011).[38]

### B. The Individual Plaintiffs' Disparate Employment Circumstances Require Decertification of Their FLSA Claims

#### 1. Application of the Administrative Exemption Requires Highly Individualized Analysis

Plaintiffs challenge Allstate's classification of its Adjusters as subject to the administrative exemption to the FLSA's overtime pay requirements. An employee falls within this exemption if she is paid on a salary basis of at least $455 per week and her "primary duty" (i) consists of office non-manual work directly related to the employer's management or general

---

[38] The Court in *Dukes* rejected the plaintiffs' attempt to extrapolate a common issue from anecdotal evidence of a sample of plaintiffs, holding that such evidence fell "well short" of a showing of commonality. *Id.* at 2555; *see also id.* at 2551 ("What matters to class certification ... is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."). Many courts have applied this reasoning to exempt-status misclassification cases. *See Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 647 (W.D. Pa. 2012) (*Dukes* is "instructive in collective action context"); *Spellman v. Am. Eagle Exp., Inc.*, No. 10-1764, 2011 WL 4014351, at *1 n.1 (E.D. Pa. July 21, 2011) (*Dukes* is persuasive authority at second stage of collective action certification); *MacGregor v. Farmers Ins. Exch.*, No. 2:10-CV-03088, 2011 WL 2981466, at *4 (D.S.C. July 22, 2011) (applying "illuminating" reasoning of *Dukes* to determine whether class members were similarly situated in FLSA collective action); *Pefanis v. Westway Diner, Inc.*, No. 08 Civ. 002, 2010 WL 3564426, at *3-4 (S.D.N.Y. Sept. 7, 2010) (in context of motion to decertify, "similarly situated" inquiry turns on whether plaintiffs make "persuasive showing" that claims derive from "common practice or scheme that violated the law"); *Ruiz v. Serco, Inc.*, No. 10-cv-394, 2011 U.S. Dist. LEXIS 91215, at *18 (W.D. Wis. Aug. 5, 2011) (denying FLSA conditional certification in misclassification case based in part upon *Dukes*, which court found "instructive" despite Rule 23 context); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-cv-592, 2011 WL 4351631 (W.D.N.C. Sept. 16, 2011) (denying conditional certification and citing *Dukes*).

business operations, and (ii) includes the exercise of "discretion and independent judgment" with respect to significant matters.  29 C.F.R. § 541.200.  The applicability of that exemption may turn on the relative importance of an employee's exempt duties as compared with other duties, the time spent on exempt work, and the relative freedom from direct supervision.  *Id.* § 541.700(a).   As such, the exemption by its nature requires a highly individualized analysis that is often inconsistent with collective treatment.

In *Myers*, the Second Circuit affirmed the denial of Rule 23 class certification in a case raising the executive exemption.   Despite the different legal context, the court's holding regarding the difficulties inherent in resolving exemption issues on a collective basis is fully applicable here:

> The exemption question ... is a mixed question of law and fact ... involving a number of subsidiary questions, each of which may or may not be able to be proven in common with respect to all ... managers.  Significantly, the regulations make clear that these questions should be resolved by examining the employees' actual job characteristics and duties.

624 F.3d at 548.  In cases challenging application of the administrative exemption, courts have similarly recognized the difficulty in allowing cases to proceed on a collective basis.[39]

---

[39]  *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (in applying administrative exemption, "our evaluation of the present FLSA claim, as in all such claims, requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities"); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) (decertifying collective action where factors for executive and administrative exemptions had to be considered because "[t]he evidence varies as to the nature and variety of decisions made by Plaintiffs, how they ran their respective stores, their authority to make independent choices, and the degree to which their recommendations were considered or reviewed at a higher level, weighing against proceeding collectively"); *Odem v. Centex Homes*, No. 3:08-cv-1196, 2010 WL 424216, at *2 (N.D. Tex. Feb. 4, 2010) (where administrative exemption is at issue, "denying class certification is the simplest and most efficient way to . . . avert the murkiness – and extensive additional cost – of carefully extracting with surgical precision the plethora of dissimilar opt-in[s]"); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 499 (D.N.J. 2000) ("extremely individual and fact-intensive" inquiry for administrative exemption required "detailed analysis of the time spent performing administrative

15

### 2. Plaintiffs Cannot Show They Are Similarly Situated Because Their Factual and Employment Settings Are Different

Plaintiffs' varied experiences require decertification of this purported nationwide collective. Their ability to carry their burden to support collective treatment is hindered by the significant differences among the job duties of Adjusters who work and worked in different offices, under the guidance of different managers, with varying degrees of independence and autonomy. Indeed, even a single Adjuster's activities may have varied considerably over time based on his or her seniority or different management expectations, and Adjusters within the same office may have different key assignments.

By Plaintiffs' own testimony, as well as that of their managers and Allstate's 30(b)(6) designee, Plaintiffs' duties vary widely based on numerous factors. This testimony reflects that their day-to-day job duties, and the amount of time they spent performing each activity, are markedly different from one another. For example, two Adjusters could both be assigned to handle PIP/MedPay claims but one might be handling "extend" claims with injuries that require long-term, in-depth medical supervision, while the other might handle only simpler claims with soft-tissue injuries that are more quickly dispensed with.[40] Some Adjusters have a practice of challenging peer reviews and IMEs while others generally follow a reviewing physician's opinion without challenge (Section III.C.4, *supra*).

Plaintiffs' duties likewise varied with respect to the manner in which they independently exercised discretion in carrying out certain duties. For example, when asked how they determine whether uninsured/underinsured bodily injury exposure exists, Kaela Brown testified that "I

---

duties and a careful factual analysis of the full range of the employee's job duties and responsibilities") (internal citations omitted).

[40] *See* Whitman Decl. Ex. AA at 11-12, 14.

don't determine if a valid uninsured, under-insured bodily injury exposure exits," while Marcianne Lobello stated, "We had to determine what coverage uninsured, underinsured motorist coverage the injured party had."  With respect to MedPay coverage, Brown testified that "I don't review and investigate Med Pay coverage issues," but Maria Perez testified that she reviewed the Med Pay policy for possible exclusions pursuant to state regulations (Section III.C.2-5, *supra*).   Other distinctions are summarized in Exhibit AA, p. 5 of the Whitman Declaration.

The record also reflect considerable distinctions among Adjusters based on the state in which they work and/or the states for which they are responsible for adjusting claims.   (*See* section III.D, *supra*.)   In Plaintiffs' Motion for Class Certification, they argue in part that provisions of New York State insurance law effectively predetermine Adjusters' duties in that State.  (Pl. Mem. (ECF No. 116) at 6-8.)  While Allstate disagrees with that contention as a factual matter, Plaintiffs' reasoning nonetheless undermines their effort to resolve the claims of all Adjusters, anywhere in the United States, in a single trial.

Plaintiffs will likely respond that any differences among the Adjusters are eliminated because of their reliance on Allstate policies, documents and software.  Although Allstate uses these materials, like any other employer, they are simply tools to facilitate the Adjusters' work, assisting them with organizing their case load and tracking deadlines, among other things, but in no way dictating the *substance* of the decisions they make every day.[41]  The decision to accept,

---

[41] In any event, courts have made clear that standardized policies, oversight, and guidance do not eliminate the individualized nature of the exemption inquiry.  *See Gardner v. Western Beef Props.*, No. 07-2345, 2011 WL 6140518, at *5 (E.D.N.Y. Sept. 26, 2011) (rejecting plaintiffs' reliance on uniform classification because exemption question "is 'answered by examining the employee's actual duties'") (quoting *Myers*, 624 F.3d at 549-50)); *Ruggles v. Wellpoint, Inc.*,

reject or further investigate claims remains at all times the responsibility of the Adjuster.[42]
Adjusters must personally review the description of the services rendered, decide whether the
services reasonably correspond with the injuries sustained in the reported accident, and
ultimately whether to pay or deny the bill.[43]

### 3.   *Allstate Has Plaintiff-Specific Defenses*

As detailed above, an exemption defense requires individualized evidence as to each
Plaintiff's duties under the statutory criteria.  Here, some Plaintiffs stated that they performed
different kinds of allegedly nonexempt work most of the time, while others stated that they
performed a significant amount of exempt work but contended that it was not their primary duty,

---

272 F.R.D. 320, 340 (N.D.N.Y. 2011) ("even if all nurses in the proposed class used the ...
[company] Guidelines, this would not dispense with the need for individualized inquiries").

[42] Sullivan Dep. 167:21-168:11 (NextGen "doesn't replace the conversations [Adjusters] need to
have with people and the types of investigations they do, but it's a way that the information is
portrayed for them if you look within the desktop…[a]nd it changed how [Adjusters] routed their
work…instead of having piles of paper someplace with handwritten notes, everything was now
on the desktop."); Turturro Dep. 164:4-14 ("NextGen doesn't prompt a field assignment. That's
[at] an Adjuster's discretion."); Gaston Dep. 70:12-14 (NextGen does not change Adjusters'
jobs, it just changes the platform on which Adjusters perform their job); Springer Dep. 63:12-21
(Adjusters not obligated to complete NextGen-generated tasks); Brown Dep. 77:3-10 (NextGen
provides task reminders from inception until closure of the claim but does not perform these
tasks for Adjusters); Sneed Dep. 67:21-23 (NextGen does not prompt Adjusters to report
something to SIU); Clark Dep. 41:10-15 ("[I]t is my decision to determine whether or not a
claim should or should not be paid.  A computer program cannot tell you to pay or not to pay.
It's basically just a tool you go by when determining whether you should or should not."); Wade
Decl. ¶ 8(e) ("NextGen system provides a 'tickler' about when to consider ordering an IME, but
the Adjuster decides whether the IME is necessary, and if so with which type of specialist.");
Hlatky Dep. 60:13-19 (MDP "was set up so you could revise, analyze and submit a bill. The
system would, as you revised it, pertain it to the fee schedule. Then you would have to make sure
you analyzed it again, re-reviewed it and then if it was correct, you would submit it and the bill
would be released.").

[43] Whitman Decl. Ex. U (Allstate 010598) (MDP "does not make claim decisions to pay or deny
bills."), (Allstate 010599) (MDP's "recommendations should be used to *guide* and assist you on
a cases by case, bill by bill basis.") (emphasis in original), (Allstate 010600) ("Final decisions
regarding how to resolve questions raised by [MDP] remain '*your*' responsibility.") (emphasis in
original).

and still others denied performing any exempt work at all.  (*See* Sections III.C2-5, *supra*; Whitman Decl. Ex. AA).  To rebut (or bolster) this testimony, Allstate will be entitled to present trial testimony from supervisors, peers, and subordinates – in other words, a series of mini-trials for each Adjuster.

Additionally, cross-examination of each Plaintiff regarding documents such as self-appraisals, declarations, and post-employment resume statements (describing their duties as Allstate Adjusters) will be relevant to the merits of each person's claim and give rise to individual credibility determinations and potential impeachment.  Plaintiffs effectively conceded as much during discussions with Allstate and the Court regarding the number of and selection process for depositions of opt-ins, when they insisted on the right to take a Rule 30(b)(6) deposition of "a person with knowledge of the duties of *each opt-in Allstate select[ed] to depose*."[44]  Likewise, Allstate has the right at trial to introduce evidence, examine witnesses and make arguments for each Plaintiff individually, not an unrepresentative sample.

The unique circumstances of the two Named Plaintiffs only underscore the need for individualized resolutions here.   Both Plaintiffs were terminated for their unacceptable performance, and are therefore unable to represent other Adjusters who may have performed their duties more closely in line with Allstate's expectations.  *See* 29 C.F.R. § 541.700(a) (employee's "primary duty" is the "principal, main, major or most important duty that the employee performs").  Each named Plaintiff also asserts her own individual retaliation claim against Allstate (*see* First Amended Complaint (ECF No. 21) ¶¶ 83-92, 101-09), further separating their individual circumstances from those of other opt-ins.

---

[44] Whitman Decl. Ex. BB (emphasis added).

These defense factors demonstrate the need for decertification to ensure a level playing field between Plaintiffs and Allstate in the prosecution and defense of the FLSA claims.  *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370 (D.N.J. 1987) ("To proceed without permitting Xerox to raise . . . each and every defense available to it where each potential class member is readily identifiable and must step forward in order to assert and prove an individual claim for liability or at least be the subject of a defense particular to each such plaintiff would deprive defendant of the Fifth Amendment right to due process."); *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04-04100, 2011 WL 564039, at *9 (D.N.J. Feb. 15, 2011) (the "potential defenses of Defendant would make collective treatment of this action unmanageable.  The deposition testimony evidences that it is not possible to develop common testimony from the [employees] regarding their daily responsibilities and duties"); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111,  1134 (N.D. Cal., 2011) (applicability of multiple exemption defenses "will necessitate individualized inquiries, making adjudication of Plaintiffs' claims by common proof difficult"); *Hinojos v. Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, at *2-3 (D. Nev. Dec. 1, 2006) ("contradictions between plaintiffs' declarations and their deposition testimony ... show the importance of cross-examination of each plaintiff. This suggests the need for separate mini-trials to resolve each individual's claim. Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach.").

### 4.    Determination of Damages Must be Individualized

The determination of each opt-in Plaintiff's potential damages would present another highly individualized inquiry incompatible with a collective proceeding.

In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the Supreme Court held that courts must apply a "rigorous analysis" in determining whether individual damages issues predominate

over issues common to the putative class – regardless of whether the damages issues overlap with the merits of the plaintiff's underlying claims. *Id.* at 1432 (citing *Dukes*, 131 S. Ct. at 2551). Because the *Comcast* plaintiffs did not offer a viable option for determining class-wide damages, the Court held that "[q]uestions of individual damage calculations will inevitability overwhelm questions common to the class," *id.* at 1433, and that class certification was improper, *id.* at 1432-33.[45]

Here, as in *Comcast*, the amount of damages to which the opt-in Plaintiffs may be entitled is not "capable of measurement on a classwide basis," 133 S. Ct. at 1433. Of all the opt-in Plaintiffs who were deposed, none worked the same number of hours per day or week, none took lunch at uniform times or of uniform duration, and none had the same number of night and/or weekend hours worked.[46] Thus, there is no rote, arithmetic formula that can determine any individual Plaintiff's entitlement (if any) to unpaid overtime. Rather, a determination of damages would require this Court to conduct individualized mini-trials about whether each Adjuster worked overtime, in which specific work weeks over the two- or three-year FLSA limitations period, and if so how much.

---

[45] *Comcast* applies to wage-and-hour certification decisions. *See, e.g., RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013) (remanding appeal of certification in wage-hour dispute to court of appeals "for further consideration in light of" *Comcast*); *Roach v. T.L. Cannon Corp.*, No. 3:10-CV-0591, 2013 WL 1316452, at *3 (N.D.N.Y. Mar. 29, 2013) (rejecting argument that damages need not be considered for purposes of Rule 23 certification, stating "This position is in contravention of the holding of" *Comcast*); *Ginsburg v. Comcast Cable Communs. Mgmt. LLC*, No. C11-1959, 2013 U.S. Dist. LEXIS 55149 (W.D. Wash. Apr. 17, 2013) (citing *Comcast* and denying class certification because plaintiffs' fact-specific claims and individualized damages would predominate over questions common to class); *Smith v. Family Video Movie Club, Inc.*, No. 11-CV-1773, 2013 U.S. Dist. LEXIS 54512, at *10 (N.D. Ill. Apr. 15, 2013) (denying certification in state law wage-hour case, noting that *Comcast* requires that "damages must be susceptible to measurement across the entire class, and individual damage calculations cannot overwhelm questions common to the class").

[46] *See* Whitman Decl. Ex. AA at 1-4.

In view of these disparities in proof on potential damages, collective action treatment is inappropriate. *See Espenscheid*, 705 F.3d at 773 (affirming decertification in part because of difficulty in determining damages where "some, maybe many, of the technicians may not work more than 40 hours a week and may even work fewer hours; others may work more than 40 hours a week"); *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-2050, 07-4012, 2011 WL 2682967, at *6 (N.D. Cal. July 8, 2011) ("In light of the Supreme Court's rejection [in *Dukes*] of [the 'Trial by Formula'] approach, it is not clear . . . how, even if class-wide liability were established, a week-by-week analysis of every class member's damages could be feasibly conducted.").

### C.   Fairness and Procedural Considerations Mandate Decertification

A primary objective of a collective action is to enhance judicial efficiency by resolving common issues of law and fact arising from the same alleged conduct. *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *see also Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1269 (M.D. Ala. 2004) (FLSA collective actions, like Rule 23 cases, are designed to achieve "economies of scale" by providing common answers to common questions using common proof) (citing *Hoffman-La Roche*). Based on the record evidence here, this case has none of those traits. Proceeding in a collective fashion would not only be tremendously costly and inefficient, but it would jeopardize the due process rights of the opt-in Plaintiffs and Allstate to a fair trial on the basis of specific individualized proof. *See Zivali*, 784 F. Supp. 2d at 459 (decertifying FLSA collective action where "the record shows an extremely wide variety of factual and employment settings among the individual plaintiffs, managers, and retail stores; this variety would in effect necessitate over four-thousand mini-trials, a result that is antithetical to collective action treatment"); *Reyes v. Texas Ezpawn, L.P.*, No. 6:03-cv-00128, 2007 WL 101808, at *6 (S.D. Tex. Jan. 8, 2007) (necessity of mini-trials outweighed potential benefits in proceeding to trial as a collective action); *Collins v. Dollar Tree Stores, Inc.*, 788 F. Supp. 2d 1328, 1345 (N.D. Ala.

2011) (decertifying nationwide action under FLSA § 216(b) based on impropriety of collective action trial when case "would necessitate hundreds, or, perhaps, thousands . . . of mini-trials" regarding whether a violation occurred in any given location).

Here, a collective action would provide no economies of scale because the questions (including damages) could not be answered without resorting to Plaintiff-specific proof. To try this case collectively would shoehorn each individual opt-in's claims for relief into a single trial on the basis of representative testimony that has never been identified and does not exist. *See Espenscheid v. Directsat USA, LLC*, No. 09-cv-00625, 2011 WL 2009967 (W.D. Wis. May 23, 2011) (decertifying collective action because plaintiffs did not explain how 42 individuals were representative of the whole or how findings as to them could be extrapolated to an absent class), *aff'd*, 705 F.3d 770 (7th Cir. 2013); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008) (decertifying and explaining that a defendant "cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other. . . . The collective action device does not effect its salutary purposes when it only puts the defendant between a rock and a hard place."); *Oetinger v. First Residential Mortg. Network, Inc.*, No. 3:06-cv-381, 2009 WL 2162963, at *4 (W.D. Ky. July 16, 2009) ("disparity between the duties, responsibilities, and amount of work performed by [each] individual" negates a collective action's benefits and dictates decertification. Any other result would restrict an employer from litigating its statutory defenses to individual claims, thus violating its due process rights).

Even where the elements of liability are less complicated and fact-specific than the exemption at issue here, courts have decertified FLSA claims where the record confirms it would be impracticable and inefficient to allow the claims "to move forward as a collective action. In

23

*Morano v. Intercontinental Capital Grp., Inc.,* No. 10 Civ. 02192, 2012 WL 2952893, at \*7 (S.D.N.Y. July 17, 2012)*,* for example, the court decertified the claims of 75 loan officer plaintiffs who worked at "no fewer than seven branches." It held:

> Despite the finding of a "systematically-applied company policy or practice," as noted above, the Court nevertheless, and after many attempts to find an efficient manner in which these claims could be tried as a collective action, finds it impracticable and inefficient to allow the Class to move forward as a collective action. This large group of plaintiffs contains too many differential circumstances; plaintiffs are not "similarly situated" and defendants have a number of defenses that go to some plaintiffs and not others.

*Id. See also Johnson*, 561 F. Supp. 2d at 574 ("the more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits – for either side – that is reached on the basis of purportedly representative evidence"); *Beauperthuy,* 772 F. Supp. 2d at 1134 ("Each Plaintiff's job duties will therefore need to be determined on an individual basis, and whether each Plaintiff qualified for an exemption to FLSA overtime requirements will also require individualized analysis. The judicial inefficiency that would result from trying Plaintiffs' claims collectively outweighs the benefits to Plaintiffs of proceeding collectively.").

All of these reasons justify decertification of Plaintiffs' conditionally-certified collective action. A collective action trial on their claims cannot be fairly and effectively managed, as the evidence demonstrates a wide variety of factors that would create insurmountable inefficiencies and eviscerate any benefit that might be achieved by a collective trial.

## V.      CONCLUSION

For the foregoing reasons, Allstate respectfully requests that this Court decertify the FLSA collective in this action and dismiss the claims of the opt-in Plaintiffs without prejudice.

DATED:  July 31, 2013                          Respectfully submitted,

                                                                SEYFARTH SHAW LLP


                                                                /s/ *Robert S. Whitman*
                                                                Robert S. Whitman
                                                                rwhitman@seyfarth.com
                                                                620 Eighth Avenue
                                                                New York, NY 10018
                                                                Telephone: (212) 218-5500
                                                                Facsimile: (212) 218-5526

                                                                *Attorneys for Defendant*
                                                                ALLSTATE INSURANCE COMPANY