**Outten & Golden LLP**
Justin M. Swartz
Ossai Miazad
Juno Turner
Michael J. Scimone
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIA VICTORIA PEREZ and KAELA R.M. BROWN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>ALLSTATE INSURANCE COMPANY,<br><br>     Defendant. | **11-CV-1812 (JB) (AKT)** |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE ACTION

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................................ 1

I.   Relevant Procedural and Discovery History.......................................................................... 2

II.  Factual Background. ................................................................................................................ 3

  A.  Reviewing Coverage ....................................................................................................... 3

  B.  Gathering Records and Obtaining Professional Opinions.............................................. 5

  C.  Paying Medical Bills ...................................................................................................... 6

  D.  There Are Few Variations in Adjusters' Work .............................................................. 7

    1.  Adjusters' Work With Processors Does Not Affect their Primary Duties............... 8

    2.  Adjusters All Have the Same Role In Reviewing Coverage ................................... 8

    3.  Adjusters Follow Established Investigation Guidelines ........................................ 10

    4.  Adjusters Do Not Challenge IME Results. ........................................................... 11

    5.  Adjusters' Primary Duties Do Not Vary By Seniority Level ............................... 11

    6.  Adjusters Work Similar Range of Hours. ............................................................. 11

III.  Argument. .............................................................................................................................. 13

    A.  Rule 23 Standards Do Not Apply to the FLSA's Liberal Joinder Rules............ 14

    B.  Adjusters Are Similarly Situated........................................................................ 16

      1.  The Factual and Employment Settings of Adjusters are Similar .................. 18

      2.  Allstate has a Single Defense ...................................................................... 21

      3.  Procedural Considerations Weigh in Favor of Collective Treatment............. 23

CONCLUSION......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alonso v. Uncle Jack's Steakhouse, Inc.*,
   No. 08 Civ. 7813, 2011 WL 4389636 (S.D.N.Y. Sept. 21, 2011)..........................................17

*Amador v. Morgan Stanley & Co. LLC*,
   No. 11 Civ. 4326**,** 2013 WL 494020 (S.D.N.Y. Feb. 7, 2013) ...............................................16

*Avila v. Northport Car Wash, Inc.*,
   774 F. Supp. 2d 450 (E.D.N.Y. 2011) ...................................................................................15

*Ayers v. SGS Control Servs., Inc.*,
   No. 03 Civ. 9078, 2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) .....................................*passim*

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013).........................................................................................................16

*Duarte v. Tri-State Physical Med. & Rehab., P.C.*,
   No. 11 Civ. 3765, 2012 WL 2847741 (S.D.N.Y. July 11, 2012) ...........................................23

*Frank v. Gold'n Plump Poultry, Inc.*,
   No. 04 Civ. 1018, 2007 WL 2780504 (D. Minn. Sept. 24, 2007) ..........................................21

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
   281 F.R.D. 100 (E.D.N.Y. 2011) .........................................................................................22

*Gayle v. Harry's Nurses Registry, Inc.*,
   No. 07 Civ. 4672, 2012 WL 686860 (E.D.N.Y. Mar. 2, 2012) .....................................*passim*

*Guzman v. VLM, Inc.*,
   No. 07 Civ. 1126, 2008 WL 597186 (E.D.N.Y. Mar. 2, 2008) ..............................................23

*Han v. Sterling National Mortgage Co., Inc.*,
   No. 09 Civ. 5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011).........................................18

*Harper v. Government Employees Insurance Co.*,
   No. 09 Civ. 2254, 2011 WL 10548148 (E.D.N.Y. June 14, 2011) *aff'd*, 826 F. Supp. 2d 454
   (E.D.N.Y. 2011).............................................................................................................17, 18

*Heagney v. European Am. Bank*,
   122 F.R.D. 125 (E.D.N.Y. 1988) .........................................................................................15

*Hoffmann-La Roche v. Sperling,*
   493 U.S. 165 (1989)..................................................................................1, 13, 22, 23

*Iglesias-Mendoza v. La Belle Farm, Inc.,*
   239 F.R.D. 363 (S.D.N.Y. 2007) ....................................................................23

*Jacobs v. New York Foundling Hospital,*
   483 F. Supp. 2d 251 (E.D.N.Y. 2007) *aff'd,* 577 F.3d 93 (2d Cir. 2009) .........13, 14

*Leyva v. Medline Indus. Inc.,*
   716 F.3d 510 (9th Cir. 2013) ..........................................................................16

*Morris v. Affinity Health Plan, Inc.,*
   859 F. Supp. 2d 611 (S.D.N.Y.2012)...............................................................16

*Morrison v. Ocean State Jobbers, Inc.,*
   290 F.R.D. 347 (D. Conn. 2013).....................................................................15

*Moss v. Crawford & Co.,*
   201 F.R.D. 398 (W.D. Pa. 2000) ....................................................................21

*Myers v. Hertz Corp.,*
   624 F.3d 537 (2d Cir. 2010)............................................................................13

*Parra v. Bashas', Inc.,*
   No. 02 Civ. 591, 2013 WL 2407204 (D. Ariz. May 31, 2013)...........................16

*Reich v. S. New England Telecomms. Corp.,*
   121 F.3d 58 (2d Cir. 1997).............................................................................22

*Rodolico v. Unisys Corp.,*
   199 F.R.D. 468 (E.D.N.Y. 2001) ..................................................................1, 15

*Scott v. Aetna Servs., Inc.,*
   210 F.R.D. 261 (D. Conn. 2002)..........................................................18, 21, 23

*Sexton v. Franklin First Fin., Ltd.,*
   No. 08 Civ. 4950, 2009 WL 1706535 (E.D.N.Y. June 16, 2009).........................17

*Spencer v. No Parking Today, Inc.,*
   No. 12 Civ. 6323, 2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013) ........................23

*Torres v. Gristede's Operating Corp.,*
   No. 04 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006).....................21, 23

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011)...............................................................................16, 20

iv

**Statutes**

29 U.S.C. § 216(b) ...................................................................................................1, 15, 16

**Other Authorities**

29 C.F.R. § 541.200 ...............................................................................................................1

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

## PRELIMINARY STATEMENT

The Court should deny Defendant's motion because Defendant concedes that all members of the collective ("Adjusters") perform the same primary duties.  Def.'s Br. 3.  This admission should dispose of Defendant's motion because this case turns on whether these primary duties, that Defendant admits all Adjusters share, are exempt duties under the administrative exemption to the Fair Labor Standards Act ("FLSA").  *See* 29 C.F.R. § 541.200.

Trivial distinctions among various Adjusters' testimony are not relevant.  Defendant only points to slight variations in how Adjusters describe their job and to fluctuations in the number of hours they work.  A careful examination of the record reveals that neither affects Adjusters' primary duties and, therefore, should not convince the Court to abandon the benefits of a collective action: namely, the "efficient resolution in one proceeding of common issues of law and fact."  *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989).

Defendant's heavy reliance on Fed. R. Civ. P. 23 ("Rule 23") class certification cases does not support its arguments.  There are significant differences between Rule 23 class actions, which adjudicate the rights of absent parties, and collective proceedings under 29 U.S.C. § 216(b), which only adjudicate the rights of participants.  *See* Section III.A., *infra*; *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001) ("the similarly situated requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions predominate") (internal quotation marks and citation omitted).  The Court should reject Defendant's attempt to conflate the two standards.

## I.      Relevant Procedural and Discovery History.

Named Plaintiffs Maria Victoria Perez and Kaela R.M. Brown filed this case on April 13,

2011.[1]  On June 26, 2012, the Court granted Plaintiffs' unopposed motion to send notice to all

similarly situated Adjusters working for Allstate in the United States.[2]  Approximately 90

Adjusters consented to join the lawsuit.[3]

Defendant has deposed nine Adjusters.[4]  Four, including Ms. Perez, Ms. Brown, Lisa

Hlatky, and Marcianne Lobello, worked at Allstate's Hauppauge, New York office, which

handles no-fault claims from New York.[5]  Three other Adjusters – Alexis Cherry, Clara

Rodriguez, and Keisha Sneed – worked in Defendant's Med Central office in Houston, Texas.[6]

The Houston office handles no-fault claims from multiple states.[7]  Two witnesses whom

Defendant deposed, Keisha Clark and Shvonna Smith, worked in Allstate's Med Central office

in Birmingham, Alabama.[8]  Like the Houston office, the office in Birmingham handles claims

from multiple states.[9]  The New York, Houston, and Birmingham offices are the three of the four

largest Allstate offices handling no-fault claims.[10]

---

[1]      Declaration of Juno Turner ("Turner Decl.") ¶ 2.
[2]      Turner Decl. ¶ 3.
[3]      Turner Decl. ¶ 4.
[4]      Turner Decl. ¶ 5.  A tenth Allstate employee, Nicholas D'Ermilio, was not a Pending No-Fault Adjuster during the time period covered by this lawsuit.  *Id*.
[5]      Turner Decl. ¶ 6.
[6]      Turner Decl. ¶ 7.
[7]      Deposition of Alexis Cherry, dated March 23, 2012, attached to the Turner Decl. as Exhibit A ("Cherry Tr."), 71:21-72:2.  Unless otherwise indicated, all exhibits are attached to the Turner Decl.
[8]      Turner Decl. ¶ 8.
[9]      Deposition of Kesha Clark, dated March 20, 2013, attached to the Turner Decl. as Exhibit B ("Clark Tr."), 53:21-54:12.
[10]      Turner Decl. ¶ 9.

II.     **Factual Background.**

Defendant's account of the duties Adjusters perform is largely accurate, although its

characterizations of those duties inaccurately exaggerates Adjusters' authority to make decisions.

*See* Def's Br. 3.  The parties do not disagree that Adjusters' primary duties include: (1)

comparing basic facts to enumerated exclusions, Def.'s Br. III.B.1; (2) checking whether an

insured's policy level is sufficient to cover the dollar amount claimed, Def.'s Br. III.B.1; (3)

recording the facts of each claim by speaking with claimants and collecting police reports,

medical records, and bills, Def.'s Br. III.B.2; (4) ordering independent medical examinations

("IMEs") and peer reviews, Def.'s Br. III.B.3; and (5) paying bills or issuing denials based on

decisions made by outside professionals or managers (not by Adjusters), in amounts dictated by

state regulations or Allstate guidelines.  Def.'s Br. III.B.2, 4.

A.     **Reviewing Coverage.**

Adjusters' work involves two things with respect to coverage: comparing basic claim

facts to see whether they fit into an enumerated exclusion from coverage and making sure that

the dollar limit on the policy will cover the amount of the claim.  Defendant agrees that Adjusters

perform these tasks.  Def.'s Br. 3-5.  With respect to exclusions, Adjusters check whether

worker's compensation is the primary coverage because the injured party was working when the

accident occurred; whether the accident involved a motorcycle; or whether a police report or

toxicology report states that the driver was intoxicated.[11]  Policy exclusions are "pretty

---

[11]     Deposition of Peter Buscemi, dated June 1, 2012, attached to the Turner Decl. as Exhibit
C ("Buscemi Tr."), 18:8-13; 19:10-19 ("they have to be someone who is inside the insured's car,
struck by the insured's car as a pedestrian or bicyclist, and nothing inside the actual claim itself
would exclude them from coverage.  There are exclusions in the policy."); 18:14-17; Ex. A
(Cherry Tr.), 294:10-16; Deposition of Maria Victoria Perez, dated March 26, 2012, attached to
the Turner Decl. as Exhibit D ("Perez Tr."), 87:16-88:13; 211:17-212:5 (could deny for DUI
confirmed by hospital toxicology report); Deposition of Marcianne Lobello, dated March 8,

clearcut;"[12] if there is a "gray area," the claim is sent out either to a separate investigation team or to an attorney for a legal opinion.[13]

Because PIP and MedPay only cover auto-related injuries, Adjusters also must deny bills for treatment that do not result from contact with an automobile.[14]  In these instances, Adjusters confirm, using basic common sense,[15] that the treatment did not result from contact with an automobile.[16]  In a close case, Allstate requires Adjusters to get an independent medical opinion from a physician stating that there is no causal relationship between the injury and an automobile accident.[17]  Adjusters from offices around the country uniformly testify that managers are heavily involved in such coverage denials.[18]  Adjusters must also compare the dollar value of the

---

2013, attached to the Turner Decl. as Exhibit E ("Lobello Tr."), 143:2-23 (could deny for DWI based on hospital records).

[12]    Ex. B (Clark Tr.), 54:11-18.

[13]    *Id.* 54:18-55:2; Ex. A (Cherry Tr.), 294:17-24; Ex. D (Perez Tr.), 207:21-208:2.

[14]    Ex. C (Buscemi Tr.) 18:8-13.

[15]    Deposition of Clara Rodriguez, dated April 18, 2013, attached to the Turner Decl. as Exhibit F ("Rodriguez Tr."), 31:25-32:10 ("Q. How do you make a determination that the notes are related?  A. Well it is experience and training, but it's also common sense . . . . the notes have to reflect physical therapy to the body areas that are indicated on the diagnosis . . . . we just want to make sure the records support what they are billing.").

[16]    Deposition of Shvonna Smith, dated March 21, 2013, attached to the Turner Decl. as Exhibit G ("Smith Tr."), 40:11-42:18; 91:6-13 (dental whitening strips or a new pair of glasses would not be covered); Deposition of Keisha Sneed, dated April 17, 2013, attached to the Turner Decl. as Exhibit H ("Sneed Tr."), 51:12-14 (diabetes testing would not be covered).

[17]    Ex A (Cherry Tr.), 294:17-24; Deposition of Lisa Hlatky, dated April 25, 2013, attached to the Turner Decl. as Exhibit I ("Hlatky Tr."), 56:6-57:3 ("we were told if you get a surgery bill, we were directed that we would have to set up a causal relationship IME, you know, by the management level."); Ex. D (Perez Tr.) 98:17-99:1; Ex. F (Rodriguez Tr.) 32:17; 33:6; 90:21-91:3.

[18]    Ex. G (Smith Tr.) 42:15-22; 66:6-67:5 ("we're pretty much advised to consult with our – you know, consult with our manager because we don't really make the decisions; we pay – we pay the bills.  We gather the information and pay the bills, but, you know, we don't really make any of the last and final decisions on the actual claims."); Ex. D (Perez Tr.) 103:9-104:5 ("A: . . . if I was going to deny something I needed authorization for that from my manager . . . ."); Ex. A (Cherry Tr.) 294:4-24 ("Q: . . . when the processor refers those claims to you what do you do with them?  A: Either document the file or look at the policy wording for that exclusion, and that is usually send out a letter, send that to the manager for approval or denial.").

4

insurance policy with the amount claimed to ensure that there is adequate monetary coverage.[19]

Def.'s Br. 4-5.  This does not vary from Adjuster to Adjuster.

> **B.      Gathering Records and Obtaining Professional Opinions.**

Adjusters consistently testify that most of their day is spent on the telephone, either speaking with claimants or talking with third parties to gather information and records.[20] Adjusters gather documents such as police reports[21] and medical records[22] as a standard part of the claim process.  They collect documents and interview claimants according to Allstate guidelines.[23]  Their interviews with claimants do not entail making credibility determinations.[24] Adjusters must carefully document every step they take so that their work may be handed off to another Adjuster if necessary.[25]

Adjusters all testify that they must seek the opinion of outside professionals at key points in the claim handling process.  Defendant agrees.  Def.'s Br. 3.  For example, Adjusters arrange for independent medical exams or a physician peer review where it is unclear whether injuries were caused by an auto accident,[26] where a claimant has received treatment for an extended

---

[19]      Ex. G (Smith Tr.) 40:3-16; Ex. H (Sneed Tr.) 48:6-24.

[20]      Deposition of Kaela R.M. Brown, dated March 28, 2012, attached to the Turner Decl. as Exhibit J ("Brown Tr.") 345:10-12 (90 percent of work day on telephone); Ex. A (Cherry Tr.), 117:12-17 (between half and three quarters of work day on telephone); Ex. B (Clark Tr.) 104:9-15 (half of work day speaking with customers); Ex. I (Hlatky Tr.) 107:10-12 (office goal that Adjusters available on phones for 65% of day); Ex. D (Perez Tr.) 147:10-12 (on phone more than 50% of work day); Ex. H (Sneed Tr.) 61:3-6 (most of work day is spend on phone).

[21]      Ex. J (Brown Tr.), 134:25-135:9; Ex. A (Cherry Tr.), 157:22-25; Ex. B (Clark Tr.), 17:15-19:18; Ex. D (Perez Tr.), 207:5-8; Ex. F (Rodriguez Tr.), 84:22-85:2; Ex. G (Smith Tr.), 164:22-165:13.

[22]      Ex. J (Brown Tr.), 72:12-18; Ex. A (Cherry Tr.) 272:4-273:5.

[23]      Ex. J (Brown Tr.) 134:25-135:5 ("We have a very regimented set of factors that we have to address on each and every file, if we miss one of those factors it brings the grade of that file that starts at a hundred and it can bring it down.").

[24]      Ex. G (Smith Tr.), 40:11-42:18.

[25]      Ex. C (Buscemi Tr.), 96:10-98:24.

[26]      Ex. A (Cherry Tr.) 260:25-261:4 ("if it is over four months it is usually not related to the

period of time,[27] or for certain treatments.[28]  Allstate encourages periodic scheduling of

independent medical exams by programming the American Medical Association's guidelines for

length of treatment into its claim handling software, so that Adjusters are prompted to set up

IMEs at the recommended intervals.[29]  Where lost wage claims require determination of the

appropriate wage rate, Adjusters consult with an outside accountant.[30]  Adjusters all follow the

recommendations of these outside professionals and do not have discretion to deviate from their

recommendations without a manager's approval.[31]  This does not vary from Adjuster to Adjuster.

### C.  Paying Medical Bills.

Adjusters receive a heavy volume of medical bills, and consistently testify that keeping

up with the volume of their claims is the most challenging aspect of their job.[32]  On a daily basis,

---

auto accident, so we would need an IME to confirm that."); Ex. I (Hlatky Tr.), 56:14-21; Ex. D
(Perez Tr.), 100:3-8 ("Well I can't determine whether it was related to the accident . . . I would
have a doctor do that because I couldn't do that."); Ex. F (Rodriguez Tr.), 57:13-16 ("the
patient's doctor determines that, and we review and depend on their notes and records to tell us
whether it's causally related treatment.").

[27]      Ex. A (Cherry Tr.), 184:17-19; Ex. I (Hlatky Tr.), 55:7-13; Ex. E (LoBello Tr.), 63:8-16;
Ex. D (Perez Tr.), 115:2-6; Ex. F (Rodriguez Tr.), 90:4-13; Ex. G (Smith Tr.), 82:10-22; Ex. H
(Sneed Tr.), 59:20-23.

[28]      Ex. I (Hlatky Tr.), 58:17-25; Ex. E (LoBello Tr.), 65:10-14 ("We were told if there was
testing over $750 we should order [a peer review]."); Ex. D (Perez Tr.), 98:11-101:5.

[29]      Deposition of Allstate Insurance Co. through Christine A. Sullivan, dated August 2,
2012, attached to the Turner Decl. as Exhibit K ("Sullivan Tr."), 110:13-111:20.

[30]      Ex. J. (Brown Tr.), 141:23-142:6 ("if it gets real complicated like that I just ask for
permission from my manager to send it out to an accountant."); Ex. E (Lobello Tr.), 45:7-12.

[31]      Deposition of Allstate Insurance Co. through Laurette Turturro, dated May 17, 2012,
attached to the Turner Decl. as Exhibit L ("Turturro Tr."), 153:19-154:10; Ex. A (Cherry Tr.),
267:23-268:7 ("it is not for me not to follow it, the IME says do not pay, I do not pay the
claim."); Ex. I (Hlatky Tr.), 111:10-17; Ex. E (Lobello Tr.), 69:8-18; Ex. D (Perez Tr.) 95:19-
96:2; Ex. F (Rodriguez Tr.), 92:17-25 ("we go on what the doctor says.  Q: Do you ever go
against what the doctor says in an IME report?  A: No."); Ex. H (Sneed Tr.), 99:4-8.

[32]      Ex. A (Cherry Tr.), 166:20-167:3; Ex. B (Clark Tr.), 105:7-14; Ex. I (Hlatky Tr.), 87:13-
88:18; Ex. E (Lobello Tr.), 107:12-17; 112:22-25; Ex. D (Perez Tr.), 144:6-11; Ex. F (Rodriguez
Tr.), 93:20-94:2.

Adjusters are responsible for paying large numbers of bills.[33]  Each state's regulations determine the amount that Allstate must pay for a given treatment – either a fixed amount based on a fee schedule, as in New York, or a "usual and customary" amount based on prevailing rates in a given area.[34]  The fee schedule or the usual and customary rate are programmed into Allstate's bill-paying software, Mitchell Decision Point, which tells Adjusters how much to pay in each instance.[35]  This does not vary from Adjuster to Adjuster.

Each day, Adjusters spend several hours "clearing" bills on the files assigned to them.[36] In doing so, they do not make individualized determinations about how much to pay – Allstate guidelines or state fee schedules provide the answers.[37]  This does not vary from Adjuster to Adjuster.

### D.    There Are Few Variations in Adjusters' Work.

Allstate claims to identify variations in Adjusters' testimony about their work.  But these purported distinctions vanish when the record testimony and context are examined.  Defendant concedes that, regardless of what state they work in, Adjusters all do the same things:  review coverage, document claims, coordinate medical reviews, and pay bills.  Def.'s Br. 3-7.  Although

---

[33]    Ex. J (Brown Tr.), 148:10-20 (closed 1,185 files in one year); Ex. A (Cherry Tr.), 287:8-12 (has from 700 to 1,200 claims pending at any given time); Ex. I (Hlatky Tr.), 87:13-16 ("I would try to release, at least, 50 to 75 bills a day"); Ex. E (Lobello Tr.), 95:5-9 (received as many as 60 files in one day); Ex. H (Sneed Tr.), 79:12-22.

[34]    Ex. K (Sullivan Tr.), 73:20-74:4; Ex. J (Brown Tr.), 89:4-9; Ex. D (Perez Tr.), 85:5-15; Ex. G (Smith Tr.), 60:23-61:1.

[35]    Ex. K (Sullivan Tr.), 73:20-74:4; Ex. I (Hlatky Tr.), 70:12-23 (". . . the system was set up to populate the correct fee schedule.  You were to, you know, make sure that it was correct based on the fee schedule.  But the actual system itself reviewed the bill and gave you the correct amount to pay and then you would have to release it for that amount."); Ex G (Smith Tr.), 60:23-61:1 ("we follow what Mitchell has stated as usual and customary").

[36]    Ex. I (Hlatky Tr.), 88:9-12; Ex. E (Lobello Tr.), 154:11-15.

[37]    Ex. J (Brown Tr.), 89:4-9; Ex. I (Hlatky Tr.), 60:8-61:17; Ex. E (Lobello Tr.), 144:14-25; Ex. D (Perez Tr.), 85:5-15; Ex. F (Rodriguez Tr.), 26:25-27:4; Ex. G (Smith Tr.), 115:11-117:22; Ex. H (Sneed Tr.), 90:3-9.

each state's regulations may suggest different timeframes[38] or reimbursement rates,[39] Adjusters perform their work the same way, using the same software systems, regardless of those variations.[40]  This standardization allows Allstate to centralize operations for multiple states within two principal offices, and Adjusters in those offices can and do handle claims for multiple states.[41]

> **1.      Adjusters' Work With Processors Does Not Affect their Primary Duties.**

Although no-fault offices may assign nonexempt processors to perform certain tasks, Def's Br. 7-8, there is no evidence suggesting that this affects Adjusters' primary duties.  *Id*.  In fact, a review of the testimony about processor duties cited by Defendant does not support Defendant's argument that, because of the work done by processors, "Adjusters can spend more time making acceptance or denial decisions."  *Id*.  Instead, this testimony explains only that processors perform a variety of clerical functions (some of which are shared by Adjusters), including speaking to claimants, requesting documents, and mailing or faxing documents.

> **2.      Adjusters All Have the Same Role In Reviewing Coverage.**

As described above, Adjusters review claims to see whether exclusions apply.

---

[38]     Ex. K (Sullivan Tr.), 20:2-8.

[39]     Ex. K (Sullivan Tr.), 73:20-74:4.

[40]     Ex. J (Brown Tr. 77:3-5 (NexGen); 92:17-19 (Mitchell Decision Point); Ex. A (Cherry Tr.) 88:12-22 (NexGen); 136:4-8 (Mitchell Decision Point); Ex. B (Clark Tr.), 48:11-16 (NexGen); 52:2-9 (Mitchell Decision Point); Ex. I (Hlatky Tr.), 67:12-68:8 (NexGen); 60:8-19 (Mitchell Decision Point); Ex. E (Lobello Tr.), 94:20-95:9 (NexGen); 39:8-13 (Mitchell Decision Point); Ex. D (Perez Tr.), 131:11-15 (NexGen); 111:8-11 (Mitchell Decision Point); Ex. F (Rodriguez Tr.), 39:11-13 (NexGen); 26:23-27:4 (Mitchell Decision Point); Ex. G (Smith Tr.), 140:6-9 (NexGen); 47:13-48:1 (Mitchell Decision Point); Ex. H (Sneed Tr.), 45:25-46:3 (NexGen); 50:12-20 (Mitchell Decision Point).

[41]     Ex. K (Sullivan Tr.), 12:7-13:6; Deposition of Melvin Springer, dated June 12, 2012, attached to the Turner Decl. as Exhibit M (Springer Tr.), 34:4-35:4 (Houston office handles claims for 15 states); Ex. A (Cherry Tr.) 73:3-12 (in Houston Med Central, has handled claims from seven different states); Ex. B (Clark Tr.), 25:17-19 (for work in Birmingham Med Central, maintains licenses for twelve states).

Defendant is wrong that Adjusters' testimony "details variation" in how they perform

this review.  Def's Br. 8.  To the contrary, Adjusters' testimony is remarkably consistent.

The only purported inconsistency that Defendant actually cites is Kaela Brown's

statement, made while reviewing a general job description that applies to adjusters throughout

Allstate's business, that she does not "determine if a valid uninsured, under-insured bodily injury

exposure exist[s],"[42] which Defendant juxtaposes with Marcianne Lobello's testimony that "[w]e

had to determine what coverage uninsured, underinsured motorist coverage the injured party

had."[43]  The apparent discrepancy is explained by the questioner's failure to define the terms

involved.  As the testimony of other Adjusters and Allstate's own documents make clear,

Adjusters simply review a checklist to see whether uninsured motorist coverage exists.[44]  If it

does, they refer the claim to another unit that handles those claims and determines whether the

claim is valid.[45]

Similarly, Defendant cites Brown's testimony that she did not "investigate . . . coverage

issues," while Perez testified that she reviewed claims for exclusions.  Def.'s Br. 8.  In fact,

many Adjusters, including both Brown and Perez, testify that they must identify exclusions from

coverage.[46]  The issue is the term "investigate," which Adjusters including Brown often disavow

because it exaggerates the importance of their tasks.[47]

---

[42]     Ex. J (Brown Tr.), 88:12-14.

[43]     Ex. E (Lobello Tr.), 142:10-12.

[44]     Ex. D (Perez Tr.), 82:4-15; Ex. N, Allstate054152 (Guideline for handling uninsured motorist claims).

[45]     *Id.*

[46]     Ex. J (Brown Tr.), 108:24-109:3 ("if I need approval or denial on a coverage issue from Peter, it has to be within a certain day from the receipt of that no-fault application."); Ex. D (Perez Tr.), 83:16-19 ("I would review the policy or any kind of like exclusion, make sure there weren't any exclusions that were from the policy or the state reg."); Ex. A (Cherry Tr.), 294:10-16; Ex. D (Perez Tr.), 87:16-88:13; 211:17-212:5 (could deny for DUI confirmed by hospital toxicology report); Ex. E (Lobello Tr.), 143:2-23 (could deny for DWI based on hospital

### 3.      Adjusters Follow Established Investigation Guidelines.

Adjusters collect bills, receipts, and police or hospital records as part of their job.  This is consistent from office to office and Adjuster to Adjuster.[48]  Defendant claims that Adjusters testify inconsistently about their role in investigations,  Def's Br. 8, but an examination of the testimony of those same Adjusters reveals that they in fact did the same thing, namely, collected documentation relevant to the claims they were processing:

> Q: . . . under position summary it says that one of the I guess aspects of your position was to secure needed items of investigation.  What if anything does that refer to in connection with your role as a pending adjuster?  A: I guess that would be the signed statements.  Q: Anything else?  A: I guess proof of payment if they said they paid cash, we would need some kind of prove [sic] of cash, receipt.  Q: And the signed statements were not something that you took personally?  A: No.

Lobello Tr. 154:24-155:13.

> Q: And the next item, the sentence if you will, to secure needed items of investigation.  Do you do that?  A: In terms of what?  Q: Well I am asking you, do you participate in any way in the investigation of claims?  A: I would have to say no.  Q: What is your reason for that response?  A: Well in my job sometimes if people submit claims for purchases, but they don't submit receipts, if you want to consider it a part of investigation for me to ask them to produce a receipt, then you could say that is part of investigation.  But generally I don't investigate claims.

Brown Tr. 72:2-18.

Regardless of whether such work is fairly described as "investigation" – which

Plaintiffs do not concede – Allstate's purported inconsistency is nonexistent.

---

records); *see also* Ex. C (Buscemi Tr.), 18:8-13; 19:10-19 ("they have to be someone who is inside the insured's car, struck by the insured's car as a pedestrian or bicyclist, and nothing inside the actual claim itself would exclude them from coverage.  There are exclusions in the policy."); 18:14-17.
[47]     *See* Ex. J (Brown Tr.), 72:12-18 ("Well in my job sometimes if people submit claims for purchases, but they don't submit receipts, if you want to consider it a part of investigation for me to ask them to produce a receipt, then you could say that is a part of investigation.  But generally I don't investigate claims."); Ex. F (Rodriguez Tr.), 56:20-57:3 ("I don't really like the wording because we're not really investigating coverage.  Either the coverage is there or it's not.  And if there's a coverage issue, then it's referred to coverage team who investigates coverage issues.").
[48]     *See* Part I.B. *supra*.

10

### 4.     Adjusters Do Not Challenge IME Results.

Defendant highlights an irrelevant difference between how Lobello and Brown

described the process of obtaining medical opinions from outside professionals.  Def's Br. 8-

9.  Lobello testified that if there was a discrepancy in a medical report she would bring it to

her supervisor's attention, then (following her supervisor's recommendation), send the report

back to the doctor for more clarity.[49]  Similarly, Brown testified about an email exchange in

which she did the same thing.[50]  The only difference between the two Adjusters' testimony is

that Brown made her request through a vendor that acted as an intermediary between

Adjusters and doctors, while Lobello contacted the doctors directly.[51]  But the testimony of

both these Adjusters – as well as that of other Adjusters around the country – makes clear

that the purpose of seeking that documentation is the same: Adjusters may not deny a claim

simply because they suspect no further treatment is warranted – rather, they must obtain a

clear finding to that effect from a doctor.[52]

### 5.     Adjusters' Primary Duties Do Not Vary By Seniority Level.

Although Adjusters are organized into various "bands" by seniority level, Def.'s Br. 9,

their primary duties remain the same.[53]  Defendant does not dispute this point, describing the

---

[49]      Ex. E (Lobello Tr.), 69:16-72:2.

[50]      Ex. J (Brown Tr.), 149:14-151:16.

[51]      Ex. E (Lobello Tr.), 70:20-22; Ex. J (Brown Tr.), 150:16-25.

[52]      Ex. L (Turturro Tr.), 147:7-11 (an independent medical exam is used "to make a determination on causality"); Ex. A (Cherry Tr.), 260:25-261:4 ("if it is over four months it is usually not related to the auto accident, so we would need an IME to confirm that."); Ex. I (Hlatky Tr.), 56:14-21; Ex. D (Perez Tr.), 100:3-8 ("I can't determine whether it was related to the accident . . . I would have a doctor do that."); Ex. F (Rodriguez Tr.), 57:13-16 ("the patient's doctor determines [causal relationship], and we review and depend on their notes and records to tell us whether it's causally related treatment.").

[53]      Ex. A (Cherry Tr.), 250:12-18 ("All adjusters do the same thing in the current office I am in, whether they are A, B, or C.").

duties of all Adjusters identically.[54]  Defendant argues instead that Adjusters' bands determine

what level of discretion they exercise, based on local management's discretion.[55]  However,

contrary to Defendant's argument, the managers of two different Allstate offices – one of which

processes claims from 15 different states – testified consistently that they expect all Adjusters to

involve managers in denials because denials frequently result in a customer escalating a

complaint to a managerial level.[56]  And Adjusters in different offices with widely varying levels

of seniority and in different band classifications all testify that in their own experience, they are

expected to obtain approval from managers when they deny claims.[57]  The main difference

between band levels – the different dollar limits on the claims that Adjusters may pay – has at

best a theoretical relationship to whether Adjusters exercise any discretion, according to

Defendant's own managers.[58]

---

[54]     Def.'s Br. 3 ("PIP and MedPay claims are handled by claims adjusters with the formal titles Claims Service Adjuster, Senior Claims Service Adjuster, or Staff Claims Service Adjuster, and are referred to within Allstate as Pending Adjusters (hereinafter referred to as "Adjusters"). Adjusters have the primary job duties of evaluating and deciding coverage, investigating claims, and determining reimbursement amounts for injury-related treatment and lost wages arising out of auto accidents.").

[55]     Ex. K (Sullivan Tr.), 65:10-66:15.

[56]     Ex. M (Springer Tr.), 34:4-35:4; (Houston office handles 15 states); 107:10-18 ("If I was going to make a full denial, I would want to have a conversation with my leader.  Q. Is that the expectation?  A. Just say that, you know, that we've sent something out in writing about it.  But if I'm a leader, I would – I would want to know because a full denial would be something that would – I would – I would expect would escalate."); Ex. L (Turturro Tr.), 124:7-11 ("If a claim is denied entirely providing no coverage whatsoever, that requires the approval of an FPL.  Q. Their supervisor?  A. Yes.").

[57]     Ex. J (Brown Tr.), 61:10-14; 70:5-14; 107:20-23; 110:16-23 (Band C Adjuster with 18-20 years in no-fault and ten years in current band sought manager's approval on coverage denials); Ex. G (Smith Tr.), 33:5-8; 42:15-22 (Adjuster with four years of experience working in Alabama had to seek manager's approval on whether to deny claims); Ex. A (Cherry Tr.), 70:11-12; 251:19-21; 294:4-24 (Band B Senior Claim Service Adjuster with four years' experience working in Texas sent denials to manager for approval).

[58]     Ex. M (Springer Tr.), 121:1-12 ("say you have $10,000 worth of authority and, say this claim could potentially be valued at 10,000 and you deny it, well, maybe theoretically, it's within your authority, however, the first party, you know, with extra contractual considerations that

12

6.    **Adjusters Work a Similar Range of Hours.**

All Adjusters testify to consistently working more than 40 hours per week.[59]  Despite

Defendant's conclusory assertion that Adjusters' testimony "shows little uniformity in the actual

hours Adjusters spend working," Def.'s Br. 10, its chart of that testimony demonstrates just the

opposite:  Adjusters consistently work approximately eight to nine hours per day, with additional

time spent working from home or on the weekends.[60]

## III.   Argument.

Collective actions advance the "broad remedial goal" of the FLSA by facilitating

the "efficient resolution in one proceeding of common issues of law and fact."  *Hoffmann-La

Roche v. Sperling*, 493 U.S. 165, 170, 173 (1989).  Collective actions proceed in two stages: "In

the first stage, which typically occurs early in the litigation, the named plaintiffs bear the

'minimal' burden of proof to show that there are other employees who are similarly situated to

them."  *Gayle v. Harry's Nurses Registry, Inc.*, No. 07 Civ. 4672, 2012 WL 686860, at *4

(E.D.N.Y. Mar. 2, 2012).  Upon that initial showing, the court will authorize notice of the action

to potential plaintiffs, allowing them to opt in.  *Id.*  After discovery closes, "[a]t the second stage,

the court must determine whether the class should be decertified or continue to trial as a

collective action."  *Id.*  It is at this point that the Court must determine "whether the plaintiffs

who have opted in are in fact similarly situated to the named plaintiffs."  *Myers v. Hertz Corp.*,

624 F.3d 537, 555 (2d Cir. 2010) (internal quotation marks omitted).  Although second-stage

review entails "a more heightened scrutiny," *Jacobs v. New York Foundling Hospital*, 483 F.

Supp. 2d 251, 265 (E.D.N.Y. 2007) *aff'd,* 577 F.3d 93 (2d Cir. 2009), plaintiffs at this stage still

---

claim could potentially be worth more than the limits . . . . The best thing is to definitely, you
know, have your manager involved.").
[59]    Def's Ex. AA, 1-4.
[60]    Def's Ex. AA, 1-4.

"'need show only that their positions are similar, not identical, to the positions held by the putative class members.'" *Ayers v. SGS Control Servs., Inc.*, No. 03 Civ. 9078, 2007 WL 646326, at *4 (S.D.N.Y. Feb. 27, 2007) (quoting *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir. 1996).

To show that they are similarly situated, Plaintiffs must demonstrate by a preponderance of the evidence that "their claims may be supported by generalized proof." *Ayers*, 2007 WL 646326, at *5 (quoting *Scott v. Aetna Servs., Inc.,* 210 F.R.D. 261, 265 (D. Conn. 2002) (internal quotation marks omitted)).  To determine whether such "generalized proof" is available, courts consider "(1) disparate factual and employment settings of the individual plaintiffs; (2) [any] defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Jacobs*, 483 F. Supp. 2d at 265 (*quoting Torres v. Gristede's Operating Corp.,* No. 04 Civ. 3316, 2006 WL 2819730, at *9 (S.D.N.Y. Sept. 29, 2006)).

Defendant fails to show that Adjusters' factual and employment settings, Allstate's individual defenses, or fairness considerations weigh against allowing Adjusters to prove their claims collectively.  On the contrary, the testimony of opt-ins from around the country shows – and Defendant concedes, *see* Def.'s Br. at 3 – that Adjusters all have the same primary duties: reviewing coverage, gathering information and professional opinions, and paying bills. Adjusters also testify consistently about how they perform those duties and their role in decisionmaking.  The court may therefore determine through a collective proceeding whether that work meets the administrative exemption criteria.

A.      **Rule 23 Standards Do Not Apply to the FLSA's Liberal Joinder Rules.**

Defendant attempts to misdirect the Court's analysis by importing case law from the Rule 23 context.  Contrary to the out-of-circuit cases Defendant cites, it is established law in this

circuit that the requirements of 29 U.S.C. § 216(b) are "considerably less stringent," than standards under Fed. R. Civ. P. 23.  *Avila v. Northport Car Wash, Inc.*, 774 F. Supp. 2d 450, 454 (E.D.N.Y. 2011).  *See also Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001) (same); *Ayers*, 2007 WL 646326, at *4 (S.D.N.Y. Feb. 27, 2007) (same); *Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347 (D. Conn. 2013) (same).  This conclusion is supported by the Advisory Committee notes from the 1966 revisions to Fed. R. Civ. P. 23(b)(3), which established Rule 23's predominance and superiority requirements, but note that "[t]he present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended."  Fed. R. Civ. P. 23, 1966 Advisory Committee's Notes.

    The standard under 29 U.S.C. § 216(b) is lower than the Rule 23 standard because a Rule 23 class action adjudicates the rights of absent class members, who may only avoid having their rights affected by affirmatively opting out.  *Rodolico*, 199 F.R.D. at 481-82.  That concern is alleviated in a class action by Rule 23(b)(3)'s predominance and superiority requirements and by the opt-out mechanism; however, "the protections afforded by the predominance requirement are largely served by the opt-in feature of section 216(b)."  *Id.* at 481.  The opt-in feature of a collective action also substitutes for Rule 23(b)(3)'s superiority requirement because "by affirmatively opting-in to the collective action, section 216(b) plaintiffs have already decided that the benefits of proceeding as a class member outweigh any benefits of proceeding individually."  *Id.* at 482.  *See also Heagney v. European Am. Bank*, 122 F.R.D. 125, 130 (E.D.N.Y. 1988) (an opt-in suit "does not fix the rights of absent parties," thus the procedural protections of Rule 23 are "not *required* by the due process clause") (emphasis in original).  The Court should therefore reject Defendant's attempt to read the higher standard of Rule 23(b)(3),

particularly the predominance requirement, into 29 U.S.C. § 216(b).  *See* Def.'s Br. 13-15; 20-22.

Defendant's reliance on *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) is particularly inappropriate.  Not only does Defendant's claim that *Comcast* "applies to wage and hour cases," Def.'s Br. 21 n.45, gloss over the important distinctions between Rule 23 cases and FLSA collective actions, it also misinterprets *Comcast*.  *Comcast* holds that "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability" in order to meet predominance.  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).  But damages in an overtime misclassification suit flow directly from the employer's policy, and calculating them is "a purely mechanical process."  *Parra v. Bashas', Inc.*, No. 02 Civ. 591, 2013 WL 2407204, *32 (D. Ariz. May 31, 2013).

Defendant's reliance on *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), is equally inappropriate.  Courts have consistently held that *Dukes* does not apply to collective actions, *see Amador v. Morgan Stanley & Co. LLC*, No. 11 Civ. 4326**,** 2013 WL 494020, at *7 (S.D.N.Y. Feb. 7, 2013); *Morris v. Affinity Health Plan, Inc.,* 859 F. Supp. 2d 611, 616 (S.D.N.Y.2012) ("The weight of authority rejects the argument that *Dukes* bars certification in wage and hour cases.") (collecting cases).  Nevertheless, the record evidence here shows that a collective proceeding is easily capable of "generating common answers," as *Dukes* requires to satisfy commonality in the Rule 23 context.  *Dukes*, 131 S. Ct. at 2551.

### B.     Adjusters Are Similarly Situated.

Defendant's argument that the administrative exemption requires an individualized analysis is belied by Allstate's across-the-board decision to classify all Adjusters as exempt.  Allstate considers all Adjusters exempt regardless of which office they work in, their seniority,

which managers they work for, whether they work with processors, or any other distinction cited

by Defendant.[61]  Where companies have made such blanket determinations, courts have rejected

the argument that collective adjudication is impossible.  *See Sexton v. Franklin First Fin., Ltd.*,

No. 08 Civ. 4950, 2009 WL 1706535, at *6 (E.D.N.Y. June 16, 2009) (detailed analysis of daily

activities and responsibilities was not required to determine whether loan officers were exempt

administrative employees since evidence showed that they had similar duties); *Alonso v. Uncle

Jack's Steakhouse, Inc.*, No. 08 Civ. 7813, 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011)

("[I]ndividual differences in number of hours worked or diligence in the use of the timekeeping

system will not warrant decertification, as long as Plaintiffs show they are subject to a single

decision, policy, or plan.") (internal quotation marks omitted)).

   Even more important than Defendant's across-the-board exemption determination is the

fact that Allstate concedes all Adjusters have the same primary duties, and can identify only

trifling differences in their testimony.  Courts have found that such differences do not preclude

collective treatment.  In *Harper v. Government Employees Insurance Co.*, No. 09 Civ. 2254,

2011 WL 10548148, at *2 (E.D.N.Y. June 14, 2011) *aff'd*, 826 F. Supp. 2d 454 (E.D.N.Y. 2011),

another insurance adjuster overtime case, the defendant made the same arguments about

individual differences based on seniority, location, and level of monetary authority that

Defendant makes here.  Nevertheless, the court concluded that conditional certification of the

collective was appropriate because the defendant did not argue that adjusters in one office were

any less qualified for the administrative exemption than others.  *Id.*  Similarly, here, Allstate

claims the same defense – not individualized defenses – for all Adjusters.  Def.'s Br. 14.

---

[61]   Deposition of Allstate Insurance Co. through Judith Y. Gaston, Esq., dated August 3, 2012, attached to the Turner Decl. as Exhibit O ("Gaston Tr."), 44:4-7 (in reviewing Adjusters' exempt classification, Allstate looked at template documents "because the goals and major responsibilities for adjusters for each type of adjuster was pretty consistent across the country.").

Although *Harper* was decided under the less-strict first stage of 216(b) certification, its reasoning is consistent with this Court's conclusion in *Han v. Sterling National Mortgage Co., Inc.*, No. 09 Civ. 5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011), under the far more strict Rule 23 standard, that as long as employees' primary job duties are similar in ways relevant to the administrative exemption criteria, *id.* at *8, other differences are not "of such a magnitude as to cause individual issues to predominate." *Id.* at *11 (internal quotation marks and citation omitted).

Here, the similar factual and employment settings of Adjusters, Allstate's unified exemption defense, and considerations of fairness all weigh in favor of collective adjudication. *See Gayle*, 2012 WL 686860, at *5-7 (collective action appropriate at second-stage certification where plaintiffs were subject to same employment policies, employer asserted single defense, and collective action would efficiently pool resources); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 265 (D. Conn. 2002) (at second stage, collective action was appropriate because plaintiffs' job duties were "quite similar" and they shared common title and job description; "[t]he 'exemption' analysis does not require a more narrow inquiry into the job duties of an employee.").

### 1.     The Factual and Employment Settings of Adjusters are Similar.

Defendant argues with sparse citation to the record that Adjusters work under different factual and employment settings. Def.'s Br. 16-18. But these conclusory assertions do not require decertification of the collective. For example, Defendant posits that "two Adjusters could both be assigned to handle PIP/MedPay claims but one might be handling 'extend' claims." Def.'s Br. 16. But Defendant cites nothing in the record that supports this assertion or

18

explains why it matters.[62]  Similarly, there is no support for Defendant's conclusory claim that

"Plaintiffs' own testimony" shows that their "duties vary widely."  Def.'s Br. 16.  Indeed, the

testimony charted by Defendant in Def.'s Ex. AA at 11-12, 14 all discusses the *same* tasks –

setting up IMEs and peer reviews.

      Defendant similarly misrepresents Adjuster testimony when it argues that some Adjusters

"have a practice of challenging peer reviews and IMEs while others generally follow a reviewing

physician's opinion without challenge."  Def.'s Br. 16.  That statement is demonstrably false.

Defendant cites testimony by Adjusters Lobello and Brown, who both say that they asked

doctors to address inconsistencies in their reports:

> If I felt there was discrepancies in his recommendation I would talk to the manager for
> her opinion . . . . I would ask the doctor to rereview the records and ask if he still adhered
> to his opinion.
>
>     Ex. E (Lobello Tr.), 69:16-70:22.
>
> The doctor was not addressing treatment in this independent medical exam and I was
> asking the doctor to address treatment . . . . any issues or concerns that we have from the
> vendors on our no-fault files we are required to bring those issues or concerns to our
> manager or the FPEs that oversee the vendors . . .

---

[62]      Defendant cites generally to three pages of its chart of Adjuster testimony, but none of
the referenced testimony speaks to "extend" claims.  Defendant does not cite the declaration of
Gregory Witherspoon, which does describe "extend" claims.  But Witherspoon's declaration
does not demonstrate that such claims are different in ways relevant to the administrative
exemption criteria.  In fact, the Witherspoon declaration describes the same primary duties that
other Adjusters perform, such as reviewing policy exclusions and limits (Witherspoon Decl. ¶ 4)
and setting up independent examinations (Witherspoon Decl. ¶ 5).  Defendant did not disclose
Mr. Witherspoon as a witness during discovery, so his contention that extend claims require
different levels of discretion has not been tested by cross-examination. But there is no reason to
think that a higher coverage limit due to PIP excess coverage or OBEL coverage alters the
discretion involved in comparing coverage amount to loss value, or to think that a greater
duration of treatment changes how much discretion is involved in setting up IMEs.  In fact, the
Witherspoon declaration says only that the questions involved are "different," not that they are
more complex or require greater discretion.  *Id*. ¶ 5.

Ex. J (Brown Tr.), 149:24-157:24.  Neither Adjuster testified that this was pursuant to their personal practice, as Defendant suggests – rather, they explained that they asked for more clarity about reports based on consultation with their managers.

Contrary to Allstate's argument, the fact that Adjusters work in different states, with marginally different insurance regulations, does not significantly impact how they do their work. See Def.'s Br. at 17.  Defendant's citation to different policy levels, timeframes, penalties, and policy terms dictated by different states' regulations does nothing to show that those regulations alter Adjusters' primary duties or how they perform them.  In fact, Defendant's assumption is contradicted by the fact that the two largest no-fault offices, in Birmingham, Alabama and Houston, Texas, both handle claims from multiple states, and Adjusters in those offices are able to handle a range of claims.[63]  Adjusters in some offices, like New York, handle primarily New York claims,[64] but there is no showing that this results in them exercising more or less discretion than other Adjusters.[65]

In fact, the record shows that Adjuster' factual and employment settings are largely the same.  All Adjusters testify that they rely on IMEs and peer reviews,[66] use the same software and

---

[63]     Ex. M (Springer Tr.), 34:4-35:4; Ex. A (Cherry Tr.), 73:3-12; Ex. B (Clark Tr.), 25:17-19.

[64]     *See* Ex. J (Brown Tr.), 63:22-64:4.

[65]     This is not to say that state regulations are irrelevant to whether Adjusters working in a single state have common job duties and responsibilities, or whether for example, a Rule 23 class action on behalf of Adjusters in New York is more likely to generate "common answers" to the questions at the heart of the exemption criteria because those Adjusters work under the same regulatory scheme.  *See Dukes*.  Put another way, the fact that all New York Adjusters follow the same set of regulations suggests that common issues exist for classwide adjudication; but this does not imply that the regulations of other states are so different that they defeat the lower "similarly situated" standard of 216(b).

[66]     Ex. A (Cherry Tr.), 260:25-261:4; Ex. I (Hlatky Tr.), 56:14-21; Ex. D (Perez Tr.), 100:3-8; Ex. F (Rodriguez Tr.), 57:13-16; Ex. E (LoBello Tr.), 63:8-16; Ex. G (Smith Tr.), 82:10-22; Ex. H (Sneed Tr.), 59:20-23.

processes to review and document claims,[67] and face similar pressures to process large volumes

of medical bills daily.[68]  This is sufficient to establish that Adjusters are in fact similarly situated.

The only requirement is that their work be "similar, not identical."  *Ayers*, 2007 WL 646326, at

*4; *see also Scott*, 210 F.R.D. at 265 ("'exemption' analysis does not require a more narrow

inquiry into the job duties of an employee" where they performed the same duties pursuant to

common policies); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 411 (W.D. Pa. 2000) (maintaining

collective certification because "differences in the plaintiffs' job duties, geographic locations and

hourly billing rates" were not significant to administrative and executive exemption defenses);

*Torres*, 2006 WL 2819730, at *10 n.9 ("On balance . . . Plaintiffs demonstrated that employees

(and co-managers in particular) did not engage in "executive" duties.").  After all, "[i]f one

zooms in close enough on anything, differences will abound . . . . But [in a 216(b) collective

action] plaintiffs' claims need to be considered at a higher level of abstraction."  *Frank v. Gold'n*

*Plump Poultry, Inc.*, No. 04 Civ. 1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007).

### 2.      Allstate has a Single Defense.

Defendant cannot claim that it will rely on individual defenses because it only has one

defense in this case: that Adjusters fall within an exemption.  Defendant relies on the same

exemption for all Adjusters, regardless of where they work.  Def.'s Br. 14.  Allstate's argument

that its defenses will be "individualized" is really just a rehashing of its argument that Adjusters'

facts are different – a claim that the record demonstrates is untrue.  *See* Section II.B.1 *supra*.

Because Adjusters' duties are substantially similar and they perform a similar mix of duties – as

---

[67]      Ex. J (Brown Tr.), 77:3-5; 92:17-19; Ex. A (Cherry Tr.), 88:12-22; 136:4-8; Ex. B (Clark
Tr.), 48:11-16; 52:2-9; Ex. I (Hlatky Tr.), 67:12-68:8; 60:8-19; Ex. E (Lobello Tr.), 94:20-95:9;
39:8-13; Ex. D (Perez Tr.), 131:11-15; 111:8-11; Ex. F (Rodriguez Tr.), 39:11-13; 26:23-27:4;
Ex. G (Smith Tr.), 140:6-9; 47:13-48:1; Ex. H (Sneed Tr.), 45:25-46:3; 50:12-20.
[68]      Ex. J (Brown Tr.), 148:10-20; Ex. A (Cherry Tr.), 166:20-167:3; Ex. B (Clark Tr.),
105:7-14; Ex. I (Hlatky Tr.), 87:13-88:18; Ex. E (Lobello Tr.), 107:12-17; 112:22-25; Ex. D
(Perez Tr.), 144:6-11; Ex. F (Rodriguez Tr.), 93:20-94:2; Ex. H (Sneed Tr.), 79:12-22.

Defendant admits, Def.'s Br. 3-7 – the determination of whether those duties satisfy the exemption criteria is a perfect issue for collective treatment. *See Scott, Inc.*, 210 F.R.D. at 265 ("several courts have held that it is appropriate to bring an FLSA exemption claim as a class action [sic.] with regard to employees who perform similar, but not identical, duties").

Defendant also claims that it must be entitled to cross-examine each Adjuster, raising the specter of "mini-trials."  But cross-examination of a single witness is not a trial, which typically involves multiple witnesses.  To the extent that Defendant means it must be allowed to cross-examine *every* Adjuster, the argument is circular: Defendant argues that because it must be allowed to examine every witness, the Court cannot allow representative testimony, which would obviate the need for individual testimony from every witness.  But determining whether Adjusters' testimony will be representative is precisely the inquiry at the heart of this motion.  If the Plaintiffs are similarly situated, there is no obstacle to allowing representative testimony, which allows the "efficient resolution in one proceeding of common issues of law and fact." *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989).  The use of such representative testimony in collective actions is well established.  *See Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) (FLSA plaintiff "need not present testimony from each underpaid employee; rather, it is well-established that [a plaintiff] may present the testimony of a representative sample of employees."); *Gayle*, 2012 WL 686860, at *5 ("Plaintiffs need not present evidence from 'each and every' opt-in Plaintiff so long as they can show that Defendants engaged in a unified policy, plan, or scheme of FLSA violations.") (internal quotation marks and citations omitted).

Finally, Defendant argues that the named Plaintiffs' retaliation claims give rise to individual defenses.  But the defenses to Brown and Perez's retaliation claims will not be

relevant to Allstate's defense to liability for overtime, and are irrelevant to whether they are similarly situated with other Adjusters with respect to their overtime claims. *See Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 281 F.R.D. 100, 107 (E.D.N.Y. 2011); *Guzman v. VLM, Inc.*, No. 07 Civ. 1126, 2008 WL 597186, at *7 (E.D.N.Y. Mar. 2, 2008); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 372 (S.D.N.Y. 2007) ("I fail to see why the circumstances of Iglesias-Mendoza's termination are relevant to whether he was paid overtime wages."); *Spencer v. No Parking Today, Inc.*, No. 12 Civ. 6323, 2013 WL 1040052, at *22 (S.D.N.Y. Mar. 15, 2013) *report and recommendation adopted,* No. 12 Civ. 6323, 2013 WL 2473039, at *1 (S.D.N.Y. June 7, 2013); *Duarte v. Tri-State Physical Med. & Rehab., P.C.*, No. 11 Civ. 3765, 2012 WL 2847741, at *9 (S.D.N.Y. July 11, 2012).

### 3.    Procedural Considerations Weigh in Favor of Collective Treatment.

The goal of the FLSA's collective action provision is to achieve efficiencies. *See Hoffmann-La Roche*, 493 U.S. at 170.  This policy goal should guide the third factor in the similarly-situated analysis, which acts as a check on whether it is fair to proceed by representational evidence. *See Torres*, 2006 WL 2819730, at *11 ("[O]n balance, the policy objectives of reducing cost and increasing efficiency are best furthered by granting collective action without undue prejudice to any party.").  Where facts show that a court may fairly make determinations based on representative testimony, fairness and procedural considerations weigh in favor of collective determination. *See Ayers*, 2007 WL 646326, at *6 ("Because . . . individual issues may be resolved separately," collective proceeding was appropriate (citing *Torres*, 2006 WL 2819730, at *11)).

Here, Defendant concedes that all Plaintiffs share the same primary duties, and Plaintiffs have presented consistent, representative testimony that they go about those duties in similar ways. *See* section II.D., *supra*.  Collective treatment is therefore appropriate. *See Scott, Inc.*,

23

210 F.R.D. at 265; *Gayle*, 2012 WL 686860, at *5; *Torres*, 2006 WL 2819730, at *10 n.9.

Particularly where, as here, relatively small-value claims make a collective proceeding more efficient by allowing litigants to pool resources, procedural considerations favor certification. *See Gayle*, 2012 WL 686860, at *6 ("Certification is favored where a collective action would lower costs to the Plaintiffs by pooling resources, efficiently resolving common issues of law and fact, and coherently managing the class in a manner that will not prejudice any party.").

## CONCLUSION

Despite Defendant's best efforts to characterize this case as one involving disparities between litigants, the record evidence shows that Adjusters perform their work using the same tools, in the same fashion, and subject to similar supervision, despite being located in different offices.  And Defendant concedes that Adjusters perform a similar mix of duties – a fact that Adjusters' testimony confirms.  This makes this case ideally suited for collective resolution. Defendant's motion should be denied.

Dated:          September 13, 2013
                New York, New York

                                        Respectfully submitted,

                                        **OUTTEN & GOLDEN LLP**
                                        By:

                                        /s/ Juno Turner
                                            Juno Turner

                                        **OUTTEN & GOLDEN LLP**
                                        Justin M. Swartz
                                        Ossai Miazad
                                        Juno Turner
                                        Michael J. Scimone
                                        3 Park Avenue, 29th Floor
                                        New York, New York 10016
                                        Telephone:  (212) 245-1000

24