# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 11-CV-1812 (JFB)(AKT)
_____

### MARIA VICTORIA PEREZ AND KAELA R.M. BROWN,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

### ALLSTATE INSURANCE COMPANY,

Defendant.

_____

**MEMORANDUM AND ORDER**
September 16, 2014
_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Maria Victoria Perez ("Perez") and Kaela R.M. Brown ("Brown") (collectively, "plaintiffs") commenced this class and collective action on behalf of themselves and others similarly situated on April 13, 2011. They allege that defendant Allstate Insurance Company ("Allstate" or "defendant") failed to compensate its Personal Injury Protection and Medical Payments claims adjusters ("Adjusters") for overtime hours, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and the New York Labor Law ("NYLL"), because Allstate misclassified Adjusters as employees subject to the administrative exemptions of the FLSA's and NYLL's overtime pay requirements.

On June 26, 2012, the Court conditionally certified a FLSA collective of similarly situated plaintiffs by granting plaintiffs' motion for court-authorized notice. Since then, ninety-three additional individuals have consented to become members of a FLSA collective in this action.

Presently before the Court are two motions: (1) defendant's motion to decertify the FLSA collective; and (2) plaintiffs' motion for class certification of their NYLL claims pursuant to Federal Rule of Civil Procedure 23. For the reasons that follow, the Court denies defendant's motion to decertify the FLSA collective and grants plaintiffs' motion for class certification. First, on the basis of testimonial and documentary evidence, plaintiffs have proven by a preponderance of the evidence that Adjusters nationwide are substantially similar in their job duties and the amount of discretion and independent judgment they exercise. Furthermore, the Court concludes that defendants have no individual defenses

1

that might otherwise preclude adjudication of the FLSA claims by collective action. In these circumstances, fairness and procedural concerns favor collective action. Thus, the Court denies defendant's motion for decertification. Second, on the basis of testimonial and documentary evidence—much of which is the same as that submitted in connection with defendant's decertification motion—plaintiffs have proven their compliance with Federal Rule of Civil Procedure 23(a) and (b)(3) by a preponderance of the evidence. With respect to Rule 23(a), the Court concludes that the class of New York Adjusters plaintiffs seek to certify is sufficiently numerous; whether this putative class was misclassified under the NYLL raises common issues of law and fact; Perez's and Brown's claims are typical of the putative class's claims; and Perez and Brown are adequate class representatives. The Court also concludes that plaintiffs have satisfied Rule 23(b)(3) because the common questions of law and fact related to the classification of all New York Adjusters as exempt employees predominates over any issues affecting individual class members. For many of the same reasons discussed in connection with the Court's analysis of defendant's motion for decertification, the Court concludes that none of the differences between members of the putative class are great enough to preclude classwide resolution of plaintiffs' NYLL claims. The Court also concludes that common issues predominate over the individualized issue of damages. Next, the Court determines that a class action is superior to other available methods of adjudicating these NYLL claims because the putative class comprises hundreds of members, many of whom have suffered a small economic loss, and a class action will conserve litigation costs for all parties. Finally, the Court appoints Outen & Golden LLP as class counsel.

## I. BACKGROUND

### A. Facts

The following facts are taken from the parties' submissions in connection with the instant motions. The Court reserves recitation of certain facts for its discussion of the specific issues raised by the pending motions.

Allstate is the second largest issuer of private passenger automobile insurance in the United States. (Turner NYLL Decl. Ex. B.) Allstate sells and services insurance products that provide Personal Injury Protection ("PIP") coverage, sometimes referred to as no-fault coverage, which reimburses covered individuals for medical expenses, lost wages, and other damages arising out of automobile accidents. (Buscemi Dep. at 15, 17–18; Sullivan Dep. at 73; Rodriguez Dep. at 36.) Allstate also offers Medical Payments ("MedPay") coverage, which pays reasonable and necessary medical and funeral expenses for an insured and others injured or killed in an automobile accident while a driver or passenger in an insured's vehicle, without regard to fault. (Buscemi Dep. at 15, 17–18; Sullivan Dep. at 14; Rodriguez Dep. at 36.) Unlike PIP, MedPay coverage depends upon the terms and conditions of a particular insurance policy, rather than state law, and it does not cover lost wages. (*See* Buscemi Dep. at 15, 17–18; Sullivan Dep. at 14; Rodriguez Dep. at 36.)

Adjusters process PIP and MedPay claims. (*See, e.g.*, Wade Decl. ¶ 3; Turturro Decl. ¶ 3.) Within Allstate, Adjusters are known as "Pending Adjusters" (Wade Decl. ¶ 3; Turturro Decl. ¶ 3; Witherspoon Decl. ¶ 2), although each Adjuster has a formal title of Claims Service Adjuster, Senior Claims Service Adjuster, or Staff Claims Service Adjuster (*see* Whitman NYLL Decl.

Ex. I; Whitman FLSA Decl. Ex. P). These titles correspond to three tiers: Band A (Claims Service Adjusters), Band B (Senior Claims Service Adjusters), and Band C (Staff Claims Service Adjusters). (*Id.*; Turturro Decl. ¶ 4.) As Adjusters move from Band A to Band C, they gain the authority to make larger payments to insured individuals. (Turturro Decl. ¶ 5.) For example, in the Islandia, New York office, Band A Adjusters have the authority to pay between $15,000 to $25,000 per claim, Band C Adjusters have the authority to pay up to $50,000 per claim, and Band B Adjusters' authority falls somewhere in between. (*Id.*)

All Adjusters perform a variety of tasks in order to process PIP and MedPay claims. After Allstate receives a claim, Adjusters must make a threshold decision about whether that claim is covered by the pertinent insurance policy. (Sullivan Dep. at 13–14.) Depending on the claim, this may involve communicating with the claimant, other parties involved in the accident, and witnesses; reviewing police reports, medical records, and pictures of the accident; and examining the terms of the insurance policy. (*Id.* at 15–25.) At this stage, an Adjuster may determine that coverage must be denied because, *inter alia*, the insurance policy was not in effect at the time of the accident, the claimant has other insurance that is primary, or an exception in the insurance policy applies (*e.g.*, the accident occurred while the claimant was driving while intoxicated, or workers' compensation covers the claim because the accident occurred while the claimant was working). (Buscemi Dep. at 67–69; Sullivan Dep. at 63–64.) Adjusters may have the authority to deny coverage without supervisory approval in certain circumstances, and Allstate gives local management some discretion in this area. (Sullivan Dep. at 66–69 (stating that local management may decide whether Adjusters need approval before denying coverage); *see*

Buscemi Dep. at 120–21 (testifying that in the Islandia, New York office, Adjusters needed his approval before denying an entire clam); Turturro Dep. at 124–25 (stating that in the Islandia, New York office, Adjusters have authority to deny an individual bill, but not coverage for entire claim, without supervisor approval); Wade Decl. ¶ 8(a) (averring that she, as Adjuster in Brooklyn, New York office, had authority to deny coverage without supervisory approval where "the accident occurred during the course of the driver's employment (such that worker's compensation coverage was exclusive); the driver was DWI; or [she] determined that a pedestrian was hit by a vehicle other than [Allstate's] insured's").)

Along with Adjusters, a claims processor handles certain clerical aspects of claim processing, but, unlike an Adjuster, he does not make decisions about coverage or paying bills. (*See, e.g.*, Lobello Dep. at 115–17 (claims processor makes initial contact with insured, and then turns file over to Adjuster); Perez Dep. at 64 (claims processor assists Adjuster by typing IME results, sorting mail, answering phones).) Adjusters' use of claims processors varies from office to office. For instance, in Allstate's Brooklyn, New York office, a claims processor always handles a claim file for the first thirty to sixty days before turning the file over to an Adjuster; by contrast, in the Buffalo, New York office, an Adjuster handles a claim file from the beginning. (Wade Decl. ¶ 7.) Indeed, members of the FLSA collective differed in how frequently they worked with claims processors. (*See, e.g.*, Perez Dep. at 69 (did not have claims processors assigned to her); Sneed Dep. at 69–70 (claims processors were assigned to her in the past); *see also* Cherry Dep. at 93 (recognizing that claims processors make initial contact with insured, but that it varies office to office).) In the Islandia, New York office, the use of claims

processors enabled Adjusters to devote more time to other tasks. (*See* Turturro Dep. at 37–40.)

Once Adjusters establish coverage, they must decide whether to pay specific bills and, if so, how much to pay. (Buscemi Dep. at 111–12; Turturro Dep. at 185–86.) As part of that responsibility, they scrutinize each medical bill to ensure that Allstate does not reimburse a claimant for medical expenses unrelated to the covered accident. (Sullivan Dep. at 26–27.) To aid them in this process, Allstate provides Adjusters with training on understanding medical bills and reports. (*Id.*) If an Adjuster is unsure about whether a medical treatment should be reimbursed, he may require an independent medical examination ("IME") of the claimant or seek "peer review"—an opinion by someone with a medical background on the medical treatment at issue. The Adjuster then uses the medical opinion developed by the IME or peer review in order to make a decision as to whether to pay the claim or to deny it. (Sullivan Dep. at 37–41; *see* Whitman NYLL Decl. Ex. R (Allstate training materials on IMEs and peer reviews).)

If an Adjuster decides to pay a medical bill, she must decide how much to pay. In connection with this task, Adjusters use software called "Mitchell Decision Point," which contains all pending medical bills and Allstate's fee schedule. (Sullivan Dep. at 32–36.) The fee schedule is determined either by state law (as is the case in New York) or Allstate's internal policy. (*Id.* at 37.) Adjusters pay the amount dictated by Allstate's fee schedule, and the software alerts Adjusters if a billed amount is inconsistent with the fee schedule. (*Id.* at 35–36.)

Adjusters also use Allstate's software system called NextGen to manage their responsibilities. (*Id.* at 166–69.) For example, NextGen reminds Adjusters to review files periodically and suggests the tasks that Adjusters should prioritize. (*Id.* at 168–69.)

All Adjusters also receive general basic training, called Tech-Cor, which is based out of Allstate's home office in Illinois. Allstate's Tech-Cor trains Adjusters how to read insurance policies, medical reports, and other relevant documents. (*Id.* at 52–55.) In addition, local Allstate offices supplement this training with state-specific training. (*Id.* at 55–56.) For example, Adjusters who process New York claims receive training on the applicable New York insurance regulations. (*Id.* at 55–56, 154.)

Since at least 1996, Allstate has classified all Adjusters as exempt administrative employees for purposes of the FLSA. (Gaston Dep. at 12.) In approximately 2004, Allstate reviewed its classification of Adjusters and determined that Adjusters qualified for the administrative exemption. (*Id.* at 26–41.) Allstate's decision covered all Adjusters; Allstate did not make this determination based upon an individualized assessment of each individual Adjuster's duties. (*Id.*)

B. Procedural History

Plaintiffs commenced this action on April 13, 2011. On April 3, 2012, plaintiffs moved for court-authorized notice to all potential opt-in plaintiffs pursuant to Section 216(b) of the FLSA. Defendant did not oppose the motion. On June 26, 2012, the Court conditionally certified a FLSA collective of similarly situated plaintiffs and granted plaintiffs' motion for court-authorized notice. Since then, ninety-three additional individuals have consented to become members of the FLSA collective.

Plaintiffs filed the present motion for class certification of their NYLL claims on June 14, 2013. Defendant opposed the motion on July 31, 2013, and plaintiffs replied on September 13, 2013. In addition, defendant filed its motion to decertify the FLSA collective on July 31, 2013. Plaintiffs opposed that motion on September 13, 2013, and defendant replied on October 4, 2013. The Court heard oral argument on both motions on December 17, 2013. This matter is fully submitted, and the Court has fully considered the submissions of the parties.

## II. FLSA AND NYLL EXEMPTIONS

Before turning to the merits of the present motions, the Court outlines the relevant law concerning the FLSA and NYLL administrative exemption. *Cf. Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (noting that class certification predominance analysis "begins, of course, with the elements of the underlying cause of action").

Both the FLSA and the NYLL require that, subject to certain exceptions, an employer must pay its employee overtime compensation "at a rate not less than one and one-half times the regular rate at which he is employed" for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1); *see Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 559 (2d Cir. 2012); N.Y. Labor Law §§ 650 *et seq.* "One exception is that the overtime-pay rule 'shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." *Ramos*, 687 F.3d at 559 (quoting 29 U.S.C. § 213(a)(1)).[1] The FLSA does not define

bona fide executive, administrative, or professional employment; rather, the statute directs the Secretary of Labor to define these terms by regulations. *Id.* (citing 29 U.S.C. § 213(a)(1)).

At issue in the present case is the administrative exemption, which applies to employees who (1) are "[c]ompensated on a salary or fee basis at a rate no less than $455 per week"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(1)–(3). "In order to determine whether an employee is properly exempt, courts must determine whether his 'primary duty' is exempt work," and the regulations set forth certain factors to aid courts in making this determination. *Indergit*, 293 F.R.D. at 638. "Under the interpretive regulations, an employee's 'primary duty' is the duty that consumes a 'major part, or over [fifty] percent, of the employee's time.'" *Reiseck*, 591 F.3d at 107 (quoting 29 C.F.R. §§ 541.103, 541.206). "Significantly, the regulations make clear that these questions should be resolved by examining the employees' actual job characteristics and duties." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010). "Accordingly, even where an employee's job description appears to exempt him from eligibility for FLSA overtime pay, if that employee's actual duties vary from the

n.1 (quoting *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010)); *see, e.g.*, *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 637 n.3 (S.D.N.Y. 2013); *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005).

---

[1] The following standards also govern the merits of plaintiffs' NYLL claims. "Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.'" *Ramos*, 687 F.3d at 556

seemingly exempt description, such that they are engaged primarily in rote, manual, and non-discretionary tasks, he would be misclassified, despite the exempt nature of his job description," and *vice versa*. *Indergit*, 293 F.R.D. at 638.

## III. FLSA COLLECTIVE ACTION

### A. Legal Standards

Section 216(b) of the FLSA authorizes an employee to file suit against his employer "for and in behalf of himself . . . and other employees similarly situated," but only if each employee "gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Thus, "[u]nlike in traditional 'class actions' maintainable pursuant to Federal Rule of Civil Procedure 23, plaintiffs in FLSA representative actions must affirmatively 'opt in' to be part of the class and to be bound by any judgment." *Myers*, 624 F.3d at 542.

"Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Id.* at 554 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)). District courts in the Second Circuit use a two-step method to decide, first, whether to facilitate such notice, and, second, whether to certify a collective action—a method that the Second Circuit has described as "sensible." *See id.* at 555; *see, e.g.*, *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 121 (S.D.N.Y. 2014). First, the court requires the named plaintiffs to make a "'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan

that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)). If the named plaintiffs meet this "low standard of proof," then the court will conditionally certify the FLSA collective and send notice to potential opt-in plaintiffs. *Id.* "At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Id.*

In the instant case, plaintiffs moved for conditional certification and court-authorized notice on April 3, 2012, defendants did not oppose the motion, and the Court granted the motion on June 26, 2012. Thereafter, ninety-three additional individuals filed their consent to participate in this action, and the parties have completed extensive discovery. Now, on the basis of the record developed by the parties, the instant case has progressed to the second phase of collective action certification, presented in the form of defendant's motion for decertification. "In determining whether to decertify, courts look to the following factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment].'" *Indergit*, 293 F.R.D. at 639 (quoting *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (quoting *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008))).

Even at the second stage of certification, the FLSA demands similar, not identical, job

duties among all collective members. *See, e.g.*, *Ayers v. SGS Control Servs., Inc.*, No. 03-CV-9078 (RMB), 2007 WL 646326, at *4 (S.D.N.Y. Feb. 27, 2007) ("'[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members.'" (quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996))). Furthermore, contrary to defendant's position, courts in the Second Circuit have recognized that the requirements of § 216(b) are "'considerably less stringent'" than those of Federal Rule of Civil Procedure 23. *See Avila v. Northport Car Wash, Inc.*, 774 F. Supp. 2d 450, 454 (E.D.N.Y. 2011) (quoting *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001)); *see also Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 361 (D. Conn. 2013) ("'Although this second step involves a 'higher standard' in analysis of the 'similarly situated' question [than did the first step], it is still considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions predominate.'" (quoting *Perkins v. S. New England Tel. Co.*, 669 F. Supp. 2d 212, 218 (D. Conn. 2009)) (brackets in original)). This Court finds these decisions persuasive, particularly because "the protections afforded by the predominance requirement are largely served by the opt-in feature of section 216(b)." *Rodolico*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001). Accordingly, the Court declines defendant's invitation to import all class action jurisprudence, including the Supreme Court's recent decisions in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), into the FLSA collective action analysis.[2]

Although the Court must decide whether to proceed with a collective action on defendant's motion for decertification, "[t]he burden is on the named plaintiff to prove that the other employees are similarly situated." *Zivali*, 784 F. Supp. 2d at 460. "While the Second Circuit has not yet addressed the specific level of proof for this second-stage inquiry, the Third Circuit has held that a preponderance of the evidence standard is appropriate when employing the decertification analysis." *Indergit*, 293 F.R.D. at 639 n.4 (citing *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 534 (3d Cir. 2012)). Courts in the Second Circuit have followed the Third Circuit, *see, e.g.*, *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 55 (W.D.N.Y. 2014), and this Court is likewise persuaded that plaintiffs must prove that the members of the collective are similarly situated by a preponderance of the evidence.

### B. Application

#### 1. Disparate Factual and Employment Settings

Defendant maintains that the core issue in this case—whether Adjusters were properly classified as exempt workers under the administrative exemption—is a highly individualized inquiry "that is often inconsistent with collective treatment," and that here, the factual and employment settings of the named and opt-in plaintiffs are too different to permit certification of the FLSA collective. (*See* Def.'s FLSA Mem., at 15.) Plaintiffs respond by pointing to evidence that Adjusters have the same actual job duties nationwide, notwithstanding any "trifling differences" in their testimony. (*See*

---

[2] Even assuming that this jurisprudence were instructive in this context, the Court would still deny

defendant's motion for the reasons discussed in connection with plaintiff's motion for class certification, *infra*.

Pls.' FLSA Opp'n, at 17.) Having reviewed the entire record, the Court concludes that plaintiffs have established by a preponderance of the evidence that all members of the collective were similarly situated for purposes of determining whether they were properly classified as exempt under the FLSA's administrative exemption.

The record before the Court includes, *inter alia*, the testimony of nine members of the FLSA collective, the testimony of other Allstate employees, and numerous corporate documents. Four members of the collective who were deposed worked at Allstate's office in Islandia, New York; three worked in Allstate's Med Central office in Houston, Texas, which handles no-fault claims from multiple states; and two witnesses worked in Allstate's office in Birmingham, Alabama, which also handles no-fault claims from multiple states. (*See* Turner FLSA Decl. ¶¶ 6–8; Clark Dep. at 53–54 (describing Birmingham office); Cherry Dep. at 71–72 (describing Houston office); Sullivan Dep. at 11–13 (describing centralization of no-fault claims into Birmingham and Houston offices, with exceptions of claims from New York, New Jersey, Florida, and Michigan).) Together, the Islandia, Houston, and Birmingham offices are three of the four largest Allstate offices that handle no-fault claims across the country. (Turner FLSA Decl. ¶ 9.)

As a general matter, it is virtually undisputed that all Adjusters share the same baseline duties, which the Court has summarized *supra*: making coverage decisions, investigating claims, and paying medical bills. (*See, e.g.*, Sullivan Dep. at 13.) Plaintiffs have shown that all Adjusters are subject to uniform policies and a uniform evaluation system, receive uniform training, and operate pursuant to a uniform job description—all common evidence of these job duties. For instance, a three-page document describing the responsibilities of Adjusters in Bands A, B, and C shows that all Adjusters are responsible for evaluating claims from the initial report to final disposition; securing needed items of investigation; accessing coverage, liability, and damages; accessing the value of a claim and negotiating settlements and denials; documenting claims files with notes, evaluations, and decision-making process; and achieving optimal customer satisfaction. (*See* Whitman FLSA Decl. Ex. P.) In making decisions about how much to pay for a claim, Adjusters rely on either a fee schedule set by state law or Allstate's internal fee schedule. (*See* Sullivan Dep. at 73–74.) In either case, Allstate's Mitchel Decision Point billing software indicates a recommended amount to pay for a given claim (*see id.*; Hlatky Dep. at 70; Smith Dep. at 60–61), although Adjusters also testified that they had the discretion to ignore the recommended payment amount (*see* Clark Dep. at 117–19; Rodriguez Dep. at 89; Smith Dep. at 56). Furthermore, all Adjusters receive Allstate's Tech-Cor training in addition to local training. (*See* Sullivan Dep. at 52–56, 154.) Finally, Allstate uniformly classified all Adjusters as exempt without making an individualized determination of each Adjuster's individual responsibilities because, as Allstate's Corporate Counsel Judith Gaston testified, "the goals and major responsibilities for adjusters for each type of adjuster was pretty consistent across the country." (Gaston Dep. at 44.) These uniform corporate procedures and policies are "unquestionably probative" of the Adjusters' actual duties. *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156–57 (S.D.N.Y. 2008); *see, e.g.*, *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08-CV-7813 (DAB), 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) ("The existence of individual differences in number of hours worked or diligence in the use of the

timekeeping system will not warrant decertification, as long as Plaintiffs show they are subject to a 'single decision, policy, or plan.'" (quoting *Ayers*, 2007 WL 646326, at *5)).

Additionally, and contrary to defendant's position, the record shows that the deposed Adjusters worked a similar number of hours—eight to nine hours per day at the office, plus time spent working from home or working on the weekends—to accomplish these tasks. (*See* Whitman FLSA Ex. AA, at 1–4 (summarizing testimony concerning hours worked).) Adjusters testified consistently that they spent half or more of this time on the telephone with claimants or third parties to make coverage decisions or investigate claims. (*See* Brown Dep. at 345; Cherry Dep. at 117–18; Clark Dep. at 104; Hlatky Dep. at 107; Perez Dep. at 146–47; Sneed Dep. at 61.) Many Adjusters also testified that paying the large volume of medical bills takes up a significant part of their time. (*See* Cherry Dep. at 166; Clark Dep. at 105; Hlatky Dep. at 87–88; Lobello Dep. at 107; Perez Dep. at 144; Rodriguez Dep. at 93–94.)

Notwithstanding this common evidence showing that every Adjuster's baseline responsibilities are the same, Allstate points to certain differences in the actual job duties of members of the FLSA collective, which, it maintains, reveal that members of the FLSA collective exercised significantly different levels of discretion and independent judgment, such that decertification is required. *Cf. Indergit*, 293 F.R.D. at 641 ("Accordingly, where there are significant differences among [plaintiffs'] testimony that go to the heart of the factors relevant to a particular exemption, decertification is appropriate."); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104–05 (D. Kan. 2012) ("Such diversity in individual employment situations inhibits Harbor Freight from proving its statutory exemption defenses relating to each individual Plaintiff's claim based on representative proof. Based on the foregoing, the Court concludes that decertifying the class is required."). The Court has evaluated each claimed difference, and concludes that none—considered either in isolation or together—warrants decertification of the FLSA collective.

### a. "Extend" Claims

Defendant argues that the primary duties of an Adjuster "vary widely" because, for example, "one might be handling 'extend' claims with injuries that require long-term, in-depth medical supervision, while the other might handle only simpler claims with soft-tissue injuries that are more quickly dispensed with." (Def.'s FLSA Mem., at 16.) According to Gregory Witherspoon, a Market Claim Manager for Allstate in the Buffalo, New York office, the Buffalo office specializes in extend cases that involve "more serious injuries." (*See* Witherspoon Decl. ¶¶ 1–3.)

The Court does not find this difference significant. Although Witherspoon avers that the extend cases "often raise different questions about the length and frequency of treatment for injuries" (*id.* ¶ 5), there is no evidence in the record that the primary duties of an Adjuster who handles extend cases differs at all from those of an Adjuster who handles claims related to less severe injuries. In other words, the distinction does not bear on whether Adjusters fall under the FLSA administrative exemption.

### b. Use of Claims Processors

Defendant also seizes on the fact that some Adjusters work with a claims processor, while others do not. (*See* Def.'s

FLSA Mem., at 7.) Despite evidence that some Adjusters receive assistance with certain responsibilities, there is no evidence that the primary duties of those Adjusters who use claims processors differs from those who do not use claims processors. Accordingly, the Court does not decertify the collective on this basis. *See, e.g.*, *Indergit*, 293 F.R.D. at 644 (denying motion for decertification where differences in the duties of employees did "not go to the heart of [their] duties" such that they were not similarly situated for purposes of determining applicability of exemption).

### c. Rank and Tenure

Defendant also contends that Adjusters' primary duties differ depending on whether they are in Band A, Band B, or Band C. (Def.'s FLSA Mem., at 9.) The Court disagrees. Although the evidence shows that an Adjuster's band determines the amount of money she is authorized to pay out, this alone does not affect the primary duties of an Adjuster such that adjudicating plaintiffs' claims by collective action would be improper. Indeed, at least one Adjuster has testified that all Adjusters in her office performed the exact same work, "whether they are A, B or C." (Cherry Dep. at 250.) To the extent more senior Adjusters in Bands B or C need less supervision and are expected to help train newer Adjusters, all the evidence in the record shows that this difference is minimal at best and does not alter the primary duties of an Adjuster. As such, the Court does not consider the differences in rank and tenure to be significant in its determination that all members of the collective are similarly situated.

### d. Variation between States

Next, defendant maintains that not all members of the FLSA collective are similarly situated because of variation between Adjusters working in different states. (*See* Def.'s FLSA Mem., at 10–11.) Again, for the reasons discussed *supra*, the evidence in the record demonstrates the opposite: that Adjusters nationwide have the same primary job duties, even if the specific implementation of those duties involves application of different state fee schedules or other state laws. To the extent defendant argues that the primary duties of some Adjusters are different because some Adjusters negotiate particular charges billed by the provider (*see* Def.'s FLSA Mem., at 11), this assertion is supported only by one statement by former Allstate Vice President of Claims Christine Sullivan, who testified in a conclusory fashion that there are "some circumstances" in which some Adjusters may have to negotiate a particular bill (*see* Sullivan Dep. at 135). The Court concludes that this general statement, without any other, more specific evidence, does not alter the Court's conclusion that the primary duties of all Adjusters in the collective were substantially similar.

### e. Making Coverage Determinations and Conducting Investigations

Defendant also identifies several discrepancies in how Brown, Perez, and Lobello—all three of whom worked in the Islandia, New York office—described their responsibilities. (*See* Def.'s FLSA Mem., at 8.) First, Brown and Lobello testified differently concerning their responsibilities for determining uninsured/underinsured motorist bodily injury exposure. Brown testified that she did not "determine if a valid uninsured, under-insured bodily injury exposure exist[ed]" (Brown Dep. at 88), while Lobello testified that she "had to determine what coverage uninsured, underinsured motorist coverage the injured party had" (Lobello Dep. at 142). Second, Brown's and Perez's descriptions of their

duty to review MedPay coverage appear to contrast. Brown testified that she did not "review and investigate Med Pay coverage issues" (Brown Dep. at 88), while Perez testified that she did review Med Pay policies for possible exclusions (Perez Dep. at 83). Third, in explaining why Allstate's description of a Band C Adjuster did not match the duties and responsibilities of her position, Brown stated that she did "not secure needed items for investigation," as Allstate's description stated. (*See* Brown Dep. at 70–71.) By contrast, when Lobello was presented with the same document, she explained that securing needed items for investigation referred to her responsibility to secure a signed statement and proof of payment. (*See* Lobello Dep. at 154–55.)

None of these purported discrepancies undermine the significant similarities between all members of the FLSA collective. As to the first issue, Perez's testimony clarifies that Adjusters did not handle uninsured and underinsured motorist bodily injury coverage; however, they did use a checklist to determine if such coverage was available. If it was, then the Adjuster would send that portion of the claim to a different person responsible for handling that kind of coverage. (*See* Perez Dep. at 82–83.) Both Perez and Lobello explained that this process involved examination of the claimant's policy to determine if such coverage existed. It thus appears to the Court that Brown was reluctant to say that she determined if the exposure existed when all she was doing was reviewing the coverage and following a checklist. In any event, the Court does not think that this difference is a meaningful one. According to Perez and Lobello, the task required was substantially no different than an Adjuster's duty to review policies to make coverage decisions. There is no added discretion inherent in this duty, such that some

Adjusters might be subject to the administrative exemption and others not.

The second and third issues appear to result from Brown's aversion to the word "investigate." (*See* Brown Dep. at 72 ("Well in my job sometimes if people submit claims for purchases, but they don't submit receipts, if you want to consider it a part of investigation for me to ask them to produce a receipt, then you could say that this is a part of investigation. But generally I don't investigate claims."); *accord* Rodriguez Dep. at 56–57 (indicating that she did not prefer to use the word "investigation" to describe her duty to determine coverage because "[e]ither the coverage is there or it's not").) Importantly, Brown's testimony does not diverge from Allstate's uniform policies or the testimony of other members of the collective concerning her duties to examine policies for possible exclusions and to obtain proof of payment, if needed. Accordingly, the Court does not decertify the collective on this basis, either.

### f. Different Practices for Challenging IMEs and Peer Reviews

Defendant also urges decertification on the basis of slightly different testimony concerning Adjusters' practices of challenging IMEs and peer review reports. (*See* Def.'s FLSA Mem., at 8–9.) In particular, Lobello testified that if a peer review report's conclusion did not match certain findings in that report, she would highlight the discrepancy to her supervisor, and then contact the peer review doctor directly to ask for a second review of the file. (*See* Lobello Dep. at 69–72.) By contrast, Brown testified that there was "usually no interaction one-on-one between [her] and the doctor." (Brown Dep. at 151.) Again, this is an immaterial distinction. Indeed, Brown also testified about an exchange wherein she challenged a

physician's report, although she did so through a third-party vendor and not with the physician directly. (*See id.* at 149–50.) Plaintiff argues persuasively that this distinction—challenging IMEs and/or peer review reports through a vendor or directly to a physician—has no bearing on whether Adjusters were properly classified as administrative exempt employees. (*See* Pls.' FLSA Opp'n, at 11.)

### g. Variations between Named Plaintiffs and the FLSA Collective

Finally, defendant argues for decertification on the basis that Perez and Brown have no personal knowledge of Allstate's offices other than its Islandia, New York office, and that they were both terminated for unacceptable performance. (*See* Def.'s FLSA Mem., at 12.) However, defendant cites no requirement, and none exists, obligating the named plaintiffs to have personal knowledge of all facts relevant to collective action certification. Moreover, to the extent defendant attempts to import the typicality requirement of Federal Rule of Civil Procedure 23 into the FLSA collective action analysis, this argument is misplaced. *See, e.g.*, *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 369 (S.D.N.Y. 2007) ("Unlike Rule 23, section 216(b) of the FLSA requires no showing of . . . typicality . . . ."). Finally, even assuming that typicality were a prerequisite to collective action certification, the Court rejects defendant's argument for the reasons discussed *infra* in connection with its typicality discussion.

\*      \*      \*

In sum, examination of the testimonial and documentary evidence reveals substantial similarity in the job duties of all Adjusters in the FLSA collective. In particular, the evidence is consistent in

terms of those factors relevant to a determination of the administrative exemption's applicability. Accordingly, the Court turns to the remaining factors in the decertification analysis.

### 2. Available Defenses and Procedural Fairness

The Court must consider whether there are defenses available to defendant which appear to be individual to each plaintiff, and whether fairness and procedural considerations weigh for or against collective action. *See, e.g.*, *Zivali*, 784 F. Supp. 2d at 460; *Laroque*, 557 F. Supp. 2d at 352. "Available defenses and procedural fairness go hand-in-hand, as '[t]he efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of [a defendant's] due process rights.'" *Indergit*, 293 F.R.D. at 649 (quoting *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1241 (N.D. Ala. 2012)) (brackets in original). Thus, the Court examines these factors together.

Essentially, defendant argues that it has plaintiff-specific defenses and would be deprived of due process if this collective action proceeded because plaintiff's actual job duties varied materially. (*See* Def.'s FLSA Mem., at 18–20.) The Court disagrees for the reasons discussed *supra*. Because the record has revealed the considerable consistency of the Adjusters' duties, "the Court is persuaded that if one [Adjuster] is properly classified as exempt, . . . so too must be all [others]." *Indergit*, 293 F.R.D. at 650. In other words, the Court's determination that all members of the FLSA collective are similarly situated means that, contrary to defendant's argument, representative testimony is a fair and efficient way to resolve plaintiffs' FLSA claims. *See, e.g.*, *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir.

1997) (noting the "well-established" practice of "present[ing] the testimony of a representative sample of employees" to prove a FLSA claim).

In addition, defendant notes that Perez and Brown have asserted individual retaliation claims against Allstate. (*See* Def.'s FLSA Mem., at 19.) As discussed *infra* in connection with the adequacy analysis of plaintiff's class certification motion, it is irrelevant for these purposes that Perez and Brown also assert separate causes of action in their individual capacities, and not as a part of the collective action.

Finally, the Court concludes that fairness and procedural considerations weigh in favor of a collective action in the instant case for the numerous reasons discussed *supra. See, e.g.*, *Indergit*, 293 F.R.D. at 650 (holding that fairness and procedural considerations weighed in favor of collective action where "the mix of duties the opt-ins perform, the discretion they have in performing those duties, and their general approach to supervision is largely similar"). Accordingly, the Court denies defendant's motion for decertification.[3]

IV. NYLL CLASS ACTION

A. Legal Standards

"Rule 23 actions are fundamentally different from collective actions under the FLSA." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1529 (2013). Therefore, class certification pursuant to Federal Rule of Civil Procedure 23 "embodies a different standard from that applicable in FLSA collective actions." *Indergit*, 293 F.R.D. at 639.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 133 S. Ct. at 1432 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)) (internal quotation marks omitted). To establish that the exception is applicable to a given case, "a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2551–52). This typically will require a plaintiff to put forth sufficient admissible evidence—in the form of "affidavits, documents, or testimony"—to show that Rule 23's requirements have been met. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) [hereinafter *In re IPO*]. The party seeking class certification bears the burden of proving compliance with each of Rule 23's requirements by a preponderance of the evidence. *Berks Cnty. Emps.' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 536 (S.D.N.Y. 2010).

Generally, there are two steps that a district court must take when considering a motion for class certification pursuant to Rule 23. *See In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 82 (S.D.N.Y. 2007). First, "the court must be persuaded, 'after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). These prerequisites are as follows:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

---

[3] The Court addresses defendant's *Comcast* argument in connection with plaintiff's motion for class certification.

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir. 2008) ("In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy."). Once a court has concluded that Rule 23(a)'s four requirements have been satisfied, it must then proceed to the second step, *i.e.*, determine "whether the class is maintainable pursuant to one of the subsections of Rule 23(b)." *Vivendi*, 242 F.R.D. at 83; *see also Comcast*, 133 S. Ct. at 1432 (noting that, in addition to satisfying Rule 23(a)'s requirements, a party "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)"). Generally speaking, Rule 23(b) addresses the types of relief available, as well as the rights of absent class members. *See* Fed. R. Civ. P. 23(b).

In this case, plaintiffs seek certification under Rule 23(b)(3). (*See* Pls.' Mot. for Class Certification, at 1.) Rule 23(b)(3) "was intended to dispose of all other cases in which a class action would be convenient and desirable, including those involving large-scale, complex litigation for money damages." *Seekamp v. It's Huge, Inc.*, No. 09-CV-00018 (LEK/DRH), 2012 WL 860364, at *6 (N.D.N.Y. Mar. 13, 2012) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998) (internal quotation marks omitted)). In particular, Rule 23(b)(3) authorizes class certification

when plaintiffs establish, "by a preponderance of the evidence, that: (1) common questions predominate over questions affecting individual plaintiffs; and (2) class resolution is the best means of adjudicating the case." *Id.* at *9; *see* Fed. R. Civ. P. 23(b)(3).

When considering whether Rule 23's requirements have been met, the Supreme Court has instructed courts that it "may be necessary for [them] to probe behind the pleadings before coming to rest on the certification question," and further, "that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 160–61 (internal quotation marks omitted)). This analysis often will "overlap with the merits of the plaintiff's underlying claim," as questions concerning class certification may be "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (quoting *Falcon*, 457 U.S. at 160) (internal quotation marks omitted). However, the Court is mindful that, although its analysis in the class certification context must be "rigorous," "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (citation and internal quotation marks omitted). That is, "[m]erits questions may be considered to the extent—*but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195 (emphasis added). The rigorous analysis required to assure "actual, not presumed conformance" with Rule 23(a) also applies with "equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)." *In re IPO*, 471 F.3d at 33 & n.3 (citation and internal quotation marks omitted). Thus, for a plaintiff to prevail on a

motion for class certification, he or she must make more than merely "'some showing'" that Rule 23's requisites have been satisfied. *Vivendi*, 242 F.R.D. at 83 (quoting *In re IPO*, 471 F.3d at 35–36).

In light of the foregoing principles, the Second Circuit has set forth the following standards that a district court must follow in considering class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re IPO*, 471 F.3d at 41.

## B. Application

Pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), plaintiffs seek to certify the following class: "All persons employed by Allstate as 'pending' No-Fault/PIP/Med-Pay adjusters whom Allstate classified as exempt from the overtime requirements of the NYLL at any time between April 13, 2005 and the date of final judgment in this matter" (the "NYLL Class"). (*See* Pls.' NYLL Mem., at 15.) Defendants object to class certification, arguing that no common issues are present, the representative plaintiffs' claims are not typical of the NYLL Class's claims, the named plaintiffs are inadequate class representatives, common issues of law or fact do not predominate, and a class action is not superior to individual litigation in this case.

For the reasons set forth below, the Court concludes that plaintiffs have met the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3). Therefore, the Court grants plaintiffs' motion for class certification and the appointment of Outten & Golden LLP as class counsel.

### 1. Rule 23(a)

#### a. Numerosity

Rule 23(a) requires the NYLL Class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible," *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993); rather, it means "difficulty or inconvenience of joinder," *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1993); *see also Casale v. Kelly*, 257 F.R.D. 396, 405 (S.D.N.Y. 2009). The Second Circuit has held that "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d

Cir. 1995); *see, e.g.*, *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 413 (S.D.N.Y. 2013) [hereinafter *Jacob I*], *modified in part*, 293 F.R.D. 578 (S.D.N.Y. 2013) [hereinafter *Jacob II*]; *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 466 (S.D.N.Y. 2005).

Here, defendant employed 331 Adjusters in New York over the last three years (Turner Decl. ¶ 8), and defendant does not contest the numerosity factor in its opposition papers. Accordingly, the Court concludes that plaintiffs have satisfied the numerosity requirement.

### b. Commonality

Rule 23 mandates that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). With respect to this requirement, the Supreme Court has recently observed that "[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 131 S. Ct. at 2551 (quoting R.A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). "'What matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* (quoting Nagareda, 84 N.Y.U. L. Rev. at 132) (emphasis in original). That said, a single common issue of law or fact suffices to satisfy Rule 23(a)(2). *See id.* at 2556. As one district court in the Second Circuit has stated, "'[c]ommonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s]

class treatment.'" *Indergit*, 293 F.R.D. at 651 (quoting *Damassia*, 250 F.R.D. at 156); *see also Jacob I*, 289 F.R.D. at 415 ("[C]ommonality does not require plaintiffs to show that class members perform identical duties—an 'impossible task.'" (quoting *White v. W. Beef Props.*, No. 07-CV-2345, 2011 WL 6140512, at *3 (E.D.N.Y. Dec. 9, 2011))). "A court may find a common issue of law even though there exists 'some factual variation among class members' specific grievances . . . .'" *Han v. Sterling Nat'l Mortg. Co.*, No. 09-CV-5589 (JFB)(AKT), 2011 WL 4344235, at *3 (E.D.N.Y. Sept. 14, 2011) (quoting *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d at 231, 240 (E.D.N.Y. 1998)). "The commonality requirement may [thus] be met when individual circumstances of class members differ, but their injuries derive from a unitary course of conduct." *Id.* (internal quotation marks and citations omitted).

In the instant case, plaintiffs raise the common question whether the members of the NYLL Class are properly exempt from the overtime requirements of the NYLL. Under *Wal-Mart*, the commonality inquiry requires the Court to decide "whether the record evidence demonstrates a likelihood that common answers" to this question will be determined by class litigation, "or conversely, whether differences among [Adjusters] will necessarily generate individualized, rather than common, determinations as this litigation moves forward." *Meyer v. U.S. Tennis Ass'n*, 297 F.R.D. 75, 83 (S.D.N.Y. 2013).

Given "the significant elements of proof that are common across all class members, and that do not require an individualized determination," the Court concludes that plaintiffs have met the commonality requirement. *See Damassia*, 250 F.R.D. at

156. Specifically, plaintiffs have shown that Adjusters in New York are subject to uniform policies and a uniform evaluation system, receive uniform training, and operate pursuant to a uniform job description—all common evidence of their job duties. *See, e.g.*, *Jacob I*, 289 F.R.D. at 415 (commonality requirement met where employees carried out duties "pursuant to a uniform policy, uniform training, uniform job description, and uniform procedures"). For instance, the record contains a three-page document describing the responsibilities of Adjusters in Bands A, B, and C. This document shows that all Adjusters are responsible for evaluating claims from the initial report to final disposition; securing needed items of investigation; accessing coverage, liability, and damages; accessing the value of a claim and negotiating settlements and denials; documenting claims files with notes, evaluations, and decisionmaking process; and achieving optimal customer satisfaction. (*See* Whitman NYLL Decl. Ex. I.) *See Han*, 2011 WL 4344235, at *4 (holding that document describing employment duties and responsibilities was a common element of proof). Moreover, a single claims process specialist—an individual responsible for ensuring that Adjusters are following the correct protocols (*see* Sullivan Dep. at 82–83)—oversees the New York Adjusters in Brooklyn, Buffalo, and Islandia. (*See* Turturro Dep. at 25–26.) Relatedly, all New York Adjusters are evaluated according to the same nationwide and New York-specific goals and standards using the same three-step evaluation process. (*See id.* at 27–28, 30–32, 40–41, 43–44; *see also* Turner NYLL Decl. Ex. F (2010 Appraisal of Kaela R. Brown).) All New York Adjusters receive Allstate's Tech-Cor training in addition to local training in New York law. (*See* Sullivan Dep. at 52-56, 154.) Finally, Allstate uniformly classifies all Adjusters as exempt without making an individualized determination of each Adjuster's individual responsibilities. Although the fact of common exemption, without more, does not suffice to establish commonality, uniform exemption classification "is certainly relevant to the court's decision and weighs in favor of class certification." *Jacob I*, 289 F.R.D. at 415; *see also Scott v. Chipotle Mexican Grill, Inc.*, --- F.R.D. ----, No. 12-CV-08333 (ALC)(SN), 2014 WL 2600034, at *3 (S.D.N.Y. June 6, 2014) ("[Defendant's] decision to classify all apprentices as exempt employees is the glue that the Supreme Court found lacking in [*Wal-Mart*]."). Although Allstate argues that, in fact, an Adjuster's duties varied person to person, these uniform corporate procedures and policies are "unquestionably probative" of the New York Adjusters' actual duties. *Damassia*, 250 F.R.D. at 156–57.

In sum, plaintiffs have shown that the New York Adjusters "have largely consistent duties, which lend themselves to common determinations" about the propriety of their exemption from the NYLL's overtime pay requirement. *Jacob I*, 289 F.R.D. at 415. This showing is sufficient to establish the commonality requirement. *See Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 22 (2d Cir. 2013) (summary order) ("[D]istrict courts in this Circuit appropriately have certified classes in cases of this general nature, where company wide documents and policies tended to 'show that plaintiffs' jobs were similar in ways material to the establishment of exemption criteria.'" (quoting *Myers*, 624 F.3d at 549)). "[Allstate's] contention that the dissimilarity of [Adjusters'] duties defeats commonality is better suited to the predominance inquiry, discussed *infra*, together with an analysis of the Rule 23(b)(3) factors." *Jacob I*, 289 F.R.D. at 415 (citing *Myers*, 624 F.3d at

549); *see Meyer*, 297 F.R.D. at 84 ("Whether these baseline responsibilities require a degree of individualized proof that defeats the similarities of the common questions raised by Plaintiffs, again, is a question best suited for the predominance inquiry."); *Indergit*, 293 F.R.D. at 653 (same); *Damassia*, 250 F.R.D. at 157 ("In spite of these common issues, Duane Reade argues that there are material differences in the duties of different assistant managers that make an individual examination of each position necessary. But this argument does not refute the existence of common issues. Rather, it argues that whatever common issues exist are overwhelmed by issues particular to individual class members. As such, the argument is more appropriately addressed below in respect to the predominance requirement."). In sum, the Court concludes that plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### c. Typicality

Plaintiffs' claims must also be typical of the putative class's claims. Fed. R. Civ. P. 23(a)(3). This requirement is satisfied if the plaintiff shows that "the representative plaintiff's claims are based on the same legal theory and arise from the same practice or course of conduct as the other class members." *Playmobil Antitrust Litig.*, 35 F. Supp. 2d at 241; *see Robidoux*, 987 F.2d at 936 ("Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."). "[M]inor variations in the fact patterns underlying individual claims" does not defeat typicality. *Robidoux*, 987 F.2d at 937. However, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," certification of the class is improper because he or she can no longer act in the best interest of the class. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (internal citation and quotation marks omitted). A primary concern underlying this inquiry is the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).

In the instant case, for substantially the same reasons discussed *supra* in connection with commonality, the Court concludes that plaintiffs' claims are based on the same legal theory and arise from the same practice as the other class members. *See, e.g.*, *Indergit*, 293 F.R.D. at 654 ("As for typicality, given the close relationship between typicality and commonality, the aforementioned consistencies in the record show that it is fair to allow the putative 'class's claim to rise or fall with the fate of the named representative's claims.'" (quoting *Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11-CV-6546 (JPO), 2013 WL 93636, at *5 (S.D.N.Y. Jan. 9, 2013))); *Jacob I*, 289 F.R.D. at 418 (concluding that typicality met where "the particularities of these lead plaintiffs' circumstances do not 'threaten' to become the 'focus of the litigation' any more so than those of other members of the putative class"). Contrary to defendant's argument, the representative plaintiffs' claims are not necessarily atypical of the NYLL Class's claims, even though plaintiffs Perez and Brown worked in the Islandia, New York office but purport to represent a class of all Adjusters in New York. *See, e.g.*, *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10-CV-4825 (PKC), 2011 WL 2207586, at *10 (S.D.N.Y. June 2, 2011) ("Given that the plaintiffs have

established that Benefits Consultants share the core responsibility to promote and market defendant's health care services and that defendant uniformly classifies defendant as exempt from overtime regardless of geographic location or health plan promoted, the fact that the plaintiffs only promoted Medicare products in the New York City region does not render their claims atypical of those of other class members."). Because plaintiffs have established that Adjusters across New York, including the named plaintiffs, shared common job duties, plaintiffs have met the typicality requirement.

### d. Adequacy

Finally, Rule 23(a)(4) permits class certification only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To ensure that all members of the class are adequately represented, district courts must make sure that the members of the class possess the same interests, and that no fundamental conflicts exist among the members." *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013). "A class representative is a fiduciary to the class and bears a responsibility to comply with discovery requests, to possess a basic knowledge of the facts, and to participate to some minimal degree in the lawsuit to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney." *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 76 (S.D.N.Y. 1999) (internal citations and quotation marks omitted).[4]

Defendant maintains that Perez and Brown are inadequate class representatives for two reasons: (1) both were fired by Allstate for poor job performance, and (2) both have asserted separate retaliation claims against Allstate. (*See* Def.'s NYLL Opp'n, at 20.) The Court disagrees. First, the Court cannot see how the reason for Perez's and Brown's termination would be relevant to a determination of whether they had substantially the same job duties as all other members of the NYLL Class and were misclassified as exempt employees. *See Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 372 (S.D.N.Y. 2007) (rejecting argument that representative plaintiff was inadequate class representative because she had been fired for misconduct); *see also Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 281 F.R.D. 100, 107 (E.D.N.Y. 2011) (same); *Guzman v. VLM, Inc.*, No. 07-CV-1126 (JG)(RER), 2008 WL 597186, at \*7 (E.D.N.Y. Mar. 2, 2008) (same). Second, there is no evidence that Perez's and Brown's retaliation claims will impair their ability to represent the interests of the NYLL Class fairly and adequately. *See Spencer*, 2013 WL 1040052, at \*22 (holding that plaintiff's "individual retaliation claim is not relevant to determining whether [plaintiff's] interests are aligned with the class members' interests for purposes of establishing his adequacy as a class representative under Rule 23"); *Duarte v. Tri-State Physical Med. & Rehab.,*

---

[4] Before the adoption of the 2003 amendments to Rule 23, Rule 23(a)(4) also entailed an examination into the qualification, experience, and capability of class counsel. *See, e.g.*, *In re Joint E. & S. Dist.*

*Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir. 1996). After the 2003 amendment to Rule 23(g), however, "the issue of appropriate class counsel is guided by Rule 23(g) rather than Rule 23(a)(4)." *Spencer v. No Parking Today, Inc.*, No. 12-CV-6323 (ALC)(AJP), 2013 WL 1040052, at \*20 (S.D.N.Y. Mar. 15, 2013) (citing cases), *report & recommendation adopted*, 2013 WL 2473039 (S.D.N.Y. June 7, 2013); *see also Jones v. Ford Motor Credit Co.*, No. 00-CV-8330 (RJH)(KNF), 2005 WL 743213, at \*18 (S.D.N.Y. Mar. 31, 2005) (discussing 2003 amendment).

*P.C.*, No. 11-CV-3765 (NRB), 2012 WL 2847741, at *9 (S.D.N.Y. July 11, 2012) (holding that "no authority" supports the argument that a plaintiff could not adequately represent a class because of a separate retaliation claim).

In light of the evidence of common job duties between plaintiffs and the other members of the NYLL Class, discussed *supra* and *infra*, as well as the absence of any evidence of a fundamental conflict between plaintiffs and the NYLL Class, the Court concludes that plaintiffs have met the adequacy requirement of Rule 23(a)(4). *See, e.g.*, *Garcia*, 281 F.R.D. at 107 ("'The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class.'" (quoting *Damassia*, 250 F.R.D. at 158)).

### 2. Rule 23(b)(3)

Having determined that the prerequisites of Rule 23(a) have been met, the Court must decide whether the NYLL Class fits within one of the three categories of cases set forth in Rule 23(b). Plaintiffs contend that the NYLL Class should be certified under Rule 23(b)(3), which applies when "the court finds that the questions of law or fact common to the members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### a. Predominance

As a general matter, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (internal citation and quotation marks omitted). The Second Circuit has held that "[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). The predominance inquiry is, therefore, related to the commonality and typicality prongs of Rule 23(a), but it "is a more demanding criterion than the commonality inquiry under Rule 23(a)." *Id.*

Defendant maintains that individual issues of law and fact predominate, including each NYLL Class member's: (1) actual job duties, as relevant to determine the applicability of the administrative exemption; and (2) damages. The Court disagrees and concludes that plaintiffs have, in fact, established the predominance requirement by a preponderance of the evidence.

### i. Liability

As an initial matter, the Second Circuit has explained that the applicability of an exemption is not "an *inherently* individualized inquiry, such that class treatment will never be appropriate in exemption cases," noting that "district courts in this Circuit have certified classes on state law claims that turn on the question of FLSA exemption for a particular group of employees." *Myers*, 624 F.3d at 549 (emphasis in original). Although the exemption inquiry involves determining the duties performed by each employee, the "evidence tending to show that the plaintiffs' jobs were similar in ways material

to the establishment of the exemption criteria . . . will tend to show that the subsidiary questions involved in resolving exemption will be answerable through evidence generally applicable to the class." *Id.* (citing *Damassia*, 250 F.R.D. at 156–61). In other words, "so long as plaintiffs can demonstrate that the duties of [New York Adjusters] were largely similar, the predominance inquiry is satisfied in favor of class certification." *Han*, 2011 WL 4344235, at *9; *see Myers*, 624 F.3d at 149–50 (concluding that plaintiffs failed to demonstrate that putative class members' duties "do not vary materially"). The fact that, as in this case, Allstate had a "blanket exemption policy . . . suggests 'the employer believes some degree of homogeneity exists among the employees,' and is thus in a general way relevant to the inquiry here[; however,] the existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'" *Myers*, 624 F.3d at 549 (quoting *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 957, 959 (9th Cir. 2009)).

The Court concludes that the primary job duties of New York Adjusters are largely similar for purposes of the NYLL administrative exemption determination based on the evidence presented by the parties. Contrary to defendant's position, this record includes evidence relating to Allstate's three offices in New York, not just the Islandia, New York office (although all members of the NYLL Class who were deposed worked only in that office). *Cf. Myers*, 624 F.3d at 549–50 (upholding decision to deny certification of class of Hertz employees, in part because plaintiffs submitted evidence relating to only one Hertz location). The Court finds *Damassia*, which was cited favorably by the Second

Circuit in *Myers*, particularly instructive and persuasive here. As in *Damassia*, "there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies," 250 F.R.D. at 160, which the Court has discussed at length *supra*. In these circumstances, "district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities." *Id.* (citing cases). Moreover, the deposition testimony of the New York Adjusters is largely consistent as it relates to their primary duties as Allstate Adjusters. *See, e.g.*, *id.* at 159–60 ("Nor does the testimony of assistant managers themselves reveal material differences in their responsibilities," concluding that deposition testimony supported "[]continuity in the roles of different assistant managers" among different offices.).

Nonetheless, defendant claims to have identified a series of differences between New York Adjusters that, it contends, cause individual issues to predominate. Most of the claimed differences—related to the handling of extend claims, the use of claims processors, the three levels of Adjusters, purported differences in testimony related to coverage determinations and investigations, and purported differences among practices in challenging IME and peer review reports—are the same as those raised in connection with defendant's motion to decertify the FLSA collective. (*See* Def.'s NYLL Opp'n, at 4, 6–9.) The Court has already addressed defendant's arguments with respect to these differences and need not repeat its analysis here. In brief, for the reasons discussed *supra* in its analysis of defendant's decertification motion, the Court concludes that none of these differences, examined separately or together, establish that the primary duties of New

York Adjusters varied from individual to individual. Thus, the Court cannot conclude on the basis of these purported differences that common issues of law and fact do not predominate over individual issues.

Defendant also cites evidence suggesting that some Adjusters may deny coverage without supervisory approval, whereas others must obtain such approval. (*See* Def.'s NYLL Opp'n, at 16–17 (citing Wade Decl. ¶ 8(a).) In particular, Diane Wade, who worked as an Adjuster in the Brooklyn, New York office from 2002 to 2010, avers that she had the authority to deny coverage because "the accident occurred during the course of the driver's employment (such that worker's compensation coverage was exclusive); the driver was DWI; or [she] determined that a pedestrian was hit by a vehicle other than [Allstate's] insured's." (*See* Wade Decl. ¶ 8(a).) At most, this evidence suggests that Wade made certain basic, non-discretionary decisions about coverage based upon clear company policy mandating the denial of coverage in those circumstances. (*See* Turner NYLL Decl. Ex. P (templates for denying coverage on basis of, *inter alia*, worker's compensation and DWI, indicating that denial for these reasons is automatic and not product of discretionary decisionmaking); Perez Dep. at 82–83 (describing checklist used to determine coverage).) That Wade implemented clear company policies regarding coverage under less supervision than others does not suggest variation in the primary duties of New York Adjusters or the amount of discretion they exercise. *Cf.* 29 C.F.R. § 541.202(e) (in determining whether employee exercises sufficient discretion and independent judgment for administrative exemption to apply, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established

techniques, procedures or specific standards described in manuals or other sources").

In sum, although there may be some differences in the job duties of New York Adjusters, "there is no evidence that they are of such a magnitude as to cause individual issues to predominate." *Damassia*, 150 F.R.D. at 160; *see also Jacob I*, 289 F.R.D. at 419 (holding that "such distinctions do not defeat predominance unless they overshadow those common threads that bind the claims of a putative class").

ii. Damages

In addition to the arguments considered *supra*, defendant maintains that plaintiffs cannot satisfy the predominance element of Rule 23(b)(3) because of "evident variations on potential damages" that would "require a series of mini-trials about specific hours worked, by whom, and when." (*See* Def.'s NYLL Opp'n, at 23.) Plaintiffs concede that the calculation of damages for each NYLL Class member is not amenable to classwide proof in the sense that each class member's damages are different; however, plaintiff contends that the common issues concerning liability predominate over the issue of damages. (*See* Pls.' NYLL Reply, at 9–10.) Because defendant relies heavily upon the Supreme Court's recent decision in *Comcast*, the Court begins its analysis with a discussion of that decision.

*Comcast* involved an antitrust class action. The plaintiffs in *Comcast* had alleged four theories of antitrust impact, but the district court concluded that only one theory of liability (the "overbuilder theory") was amenable to classwide proof. *See id.* at 1430–31. The model for calculating damages, however, "did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 1431. Nonetheless, the

district court found that damages could be calculated on a classwide basis, and the Third Circuit affirmed. *See id.* The Supreme Court reversed the Third Circuit's decision because the plaintiffs' damages model could not "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding." *See id.* at 1435. Consequently, the Court concluded, plaintiffs' "model [fell] far short of establishing that damages are capable of measurement on a classwide basis." *Id.* at 1433. Significantly, "the need to prove damages on a classwide basis through a common methodology was never challenged by [plaintiffs]" in this case. *Id.* at 1437 (Ginsburg & Breyer, JJ., dissenting).

*Comcast*, thus, requires a putative class's theory of damages to correspond to that class's theory of liability. *See id.* at 1433 ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of violation." (internal citation and quotation marks omitted)); *accord In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("*Comcast* held that a district court errs by premising its Rule 23(b)(3) decision on a formula for classwide measurement of damages whenever the damages measured by that formula are incompatible with the class action's theory of liability."); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) ("*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges." (emphasis in original)); *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (holding that, under *Comcast*, "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability"). More generally, *Comcast* stands for the proposition that damages must be considered as part of the predominance analysis, yet that holding breaks no new ground, at least in this Circuit. Several years before *Comcast*, the Second Circuit held in *McLaughlin v. American Tobacco Co.* that "while the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification, it is nonetheless a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." 522 F.3d 215, 231 (2d Cir. 2008) (internal citations omitted), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). However, neither *Comcast* nor any other binding authority holds that the need to calculate damages on an individualized basis necessarily defeats the predominance element of Rule 23(b)(3). *See, e.g.*, *Comcast*, 133 S. Ct. at 1437 (Ginsburg & Breyer, JJ., dissenting) ("In the mine run of cases, it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members."). Decisions from several Courts of Appeals have confirmed this last point. *See Deepwater Horizon*, 739 F.3d at 815 ("According to BP and the Objectors, the Supreme Court's recent decision in *Comcast* . . . precludes certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement. This is a misreading of *Comcast*, however, which has already been rejected by three other circuits."); *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838, 861 (6th Cir. 2013) (concluding that individualized damages did not warrant decertification of class); *Butler*, 727 F.3d at

800–01 (same); *Levya*, 716 F.3d at 514 ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."). In fact, the Supreme Court's post-*Comcast* decision in *Amgen* reaffirmed that Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." 133 S. Ct. at 1196 (emphasis in original; internal quotation marks and brackets removed). "What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" *Id.* (emphasis and brackets in original) (quoting Fed. R. Civ. P. 23(b)(3)). To hold otherwise would "drive a stake through the heart of the class action device" in cases like this one, *Butler*, 727 F.3d at 801, as "damages determinations are individual in nearly all wage-and-hour class actions," *Levya*, 716 F.3d at 513.

Accordingly, the Court must consider the issue of damages as part of its predominance analysis. Having considered the nature of damages in this case, the Court concludes that the common issues of law and fact, discussed *supra*, predominate despite the presence of individualized damages. First, this case does not present a *Comcast* problem because, "if putative class members prove [defendant's] liability, damages will be calculated based on the wages each employee lost due to [defendant's] unlawful practices." *Levya*, 716 F.3d at 514. Second, given the common issues concerning defendant's liability to all NYLL Class members, the individualized nature of damages, without more, does not defeat the predominance element. Other district courts within this Circuit, whose decisions this Court finds persuasive, have recognized that common issues of liability predominate over individual damages issues in wage-and-hour cases like this one. *See*

*Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 345 (S.D.N.Y. 2004) ("Specifically, the class action is based on defendants' alleged policy of requiring employees to work overtime hours without adequate compensation. Thus, to prevail on the merits of this claim, plaintiffs must produce evidence that defendants implemented an illegal policy with respect to overtime pay. Indeed, the gravamen of the claim is that defendants engaged in a course of conduct that deprived employees of their right to overtime pay. Although determinations as to damages, exempt status, and alleged labor agreements will require individualized findings, common liability issues otherwise predominate."); *see also Rosario v. Valentine Ave. Discount Store, Co.*, No. 10-CV-5255 (ERK)(LB), 2013 WL 2395288, at *9 (E.D.N.Y. May 31, 2013), *report & recommendation adopted*, 2013 WL 4647494 (E.D.N.Y. Aug. 29, 2013) ("While each class member will have different damages depending on the length of time they were employed, the wages they received, and the hours they worked, such questions do not defeat predominance."); *Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 538 (S.D.N.Y. 2013) ("In an FLSA class, common questions of liability predominate over individual calculations of damages."). Indeed, the Second Circuit has affirmed the certification of a class of plaintiffs alleging that their employer violated various provisions of the NYLL, despite the defendant's argument that common issues did not predominate because damages were individualized. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 253 (2d Cir. 2011). Specifically, the Second Circuit stated as follows.

> If Plaintiffs succeed in showing that the expediters, silver polishers, coffee makers, and/or managers were not eligible to receive tips under

New York law, then each of the class plaintiffs will likely prevail on his or her section 196-d claims, although class plaintiffs' individualized damages will vary. We conclude from the record before us that the District Court's finding that common questions predominate over any individualized damages issues is fully supported.

*Id.* In sum, although the individualized nature of damages means that not *all* issues are common to the NYLL Class, the Court finds that the issues in common *predominate* over the individual issues.

In this regard, the Court is not persuaded by defendant's argument that determining damages will necessarily require a complex mini-trial for each of the 331 members of the NYLL Class. Even if each class member had to present some evidence of his or her individual damages, there is no suggestion that this would be a complex process, and the Court, in its discretion, does not find that any challenge presented by the calculation of damages undercuts the predominance of common issues concerning liability. Moreover, to the extent Allstate has failed to keep complete records of the hours its New York Adjusters worked, calculation of damages could present little difficulty because members of the NYLL Class may then be able to prove their damages "as a matter of just and reasonable inference" through representative testimony, so long as they "present sufficient evidence for the jury to make a reasonable inference as to the number of hours worked by the non-testifying employees." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) (internal quotation marks and citations omitted); *see Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946) (holding that a court may award "approximate" damages to employee for employer's violations of FLSA if employer fails "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence"); *Reich*, 121 F.3d at 66 (upholding back pay award to group of employees based on testimony of 2.5 percent representative sample); *Kalloo v. Unlimited Mech. Co. of NY, Inc.*, 977 F. Supp. 2d 187, 200 (E.D.N.Y. 2013) ("New York Labor Law mirrors the FLSA with regard to the burden of proof where an employer has failed to keep proper employment records.").

Finally, even if proof of individualized damages turned out to overwhelm the common issues concerning liability, the Court reserves the right to decertify the class as to damages, only, pursuant to Federal Rule of Civil Procedure 23(c)(4). *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); *Jacob II*, 293 F.R.D. at 595 (decertifying class "for damages purposes, in light of the need for individualized proof necessary to determine monies potentially owed to each [employee]"). In fact, in *In re Nassau County Strip Search Cases*, the Second Circuit explicitly approved the use of Rule 23(c)(4) "to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)." 461 F.3d 219, 227 (2d Cir. 2006). Other Circuits have also approved the limited certification of a class for determining liability, only, in the face of difficulties in measuring the individual damages of each class member. *See, e.g.*, *Butler*, 727 F.3d at 800 ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or

homogenous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) (noting that "there are ways to preserve the class action model in the face of individualized damages," such as the division of a class into subclasses for adjudication of damages); *see also Whirlpool*, 722 F.3d at 860 ("Where determinations on liability and damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of a liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis—has limited application."); *Deepwater Horizon*, 739 F.3d at 817 (same). In the instant case, however, the Court is not persuaded at this juncture that limited certification of the NYLL Class as to liability only is necessary. Instead, because the Court concludes that the common issues concerning liability overwhelm the individual issues concerning damages, the Court, in its discretion, certifies the NYLL Class as to liability and damages, without prejudice to either side making a motion for decertification of the NYLL Class as to damages (or any other issue) in the future.

b. Superiority

Where common questions of law and fact predominate over individual issues, Rule 23 further requires the Court to determine "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In determining whether these requirements are met, the Court should consider:

(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating litigation in a particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

In the instant case, the NYLL Class consists of hundreds of potential class members, most of whom are likely to have suffered a small economic loss if they prevailed on individual claims arising from the dispute that is the subject of this lawsuit. Therefore, "few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail, particularly when many of the putative plaintiffs have suffered economic loss of *de minimis* value." *Han*, 2011 WL 4344235, at *11 (internal citations and quotation marks omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003)). Furthermore, a class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses. *See In re Interpublic Sec. Litig.*, No. 02-CV-6527 (DLC), 2003 WL 22509414, at *4 (S.D.N.Y. Nov. 6, 2003); *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 282 (S.D.N.Y. 2002). Lastly, the Court does not believe that this case poses manageability difficulties that justify denying certification. *See Vivendi*, 242 F.R.D. at 107 ("The determination of whether a particular action is manageable is 'peculiarly' within the discretion of the district court." (quoting *In re VISA Check/MasterMoney Antitrust Litig.*, 280

F.3d 124, 141 (2d Cir. 2001))). Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this litigation.[5]

### 3. Class Counsel

The Court has decided to certify the NYLL class. Thus, the Court must consider plaintiffs' unopposed motion to appoint Outten & Golden LLP ("O&G") as class counsel. Federal Rule of Civil Procedure 23(g) requires a court to consider the following four factors in appointing class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). The Court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

In the instant case, O&G "have shown themselves to be vigorous representatives of the putative class," *Jacob I*, 289 F.R.D. at 423, by conducting extensive discovery and advocating zealously for the certification of the NYLL Class as well as the certification of the FLSA collective. Moreover, the Court concludes that O&G has the requisite

experience in handling class actions and the particular claims asserted in the instant action, are well versed in the applicable law, and have the resources necessary to represent the NYLL Class fairly and adequately. *See, e.g.*, *id.* at 423 (in wage and hour class action, concluding that O&G "have experience in handling class actions, sufficient knowledge of the pertinent law, and sufficient resources to commit to this representation"); *Dorn v. Eddington Sec., Inc.*, No. 08-CV-10271 (LTS), 2011 WL 382200, at *3 (S.D.N.Y. Jan. 21, 2011) ("O & G has extensive experience prosecuting and settling nationwide wage and hour class and collective actions and are well-versed in wage and hour and class action law."); *Westerfield v. Wash. Mut. Bank*, No. 06-CV-2817 (CBA)(JMA), 2009 WL 6490084, at *3 (E.D.N.Y. June 26, 2009) ("O & G's lawyers have substantial experience prosecuting and settling employment class actions, including wage and hour class actions and are well-versed in wage and hour law and in class action law."); *Damassia*, 250 F.R.D. at 165 (concluding that O&G lawyers were "experienced in handling wage and hour class actions and have knowledge of the applicable law," and that O&G has "the resources and demonstrated commitment to adequately represent the class"). Therefore, the Court grants plaintiff's motion to appoint O&G as class counsel in the instant case.

---

[5] To the extent Allstate argues that a class action is not superior because of "the variance in duties and experiences discussed above" (Def.'s NYLL Opp'n, at 24), the Court disagrees for the reasons stated in its discussion of commonality and predominance, *supra*.

## V. CONCLUSION

For the reasons set forth herein, the Court denies defendant's motion to decertify the FLSA collective, grants plaintiffs' motion for class certification, and grants plaintiffs' motion to appoint Outten & Golden LLP as class counsel.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 16, 2014
Central Islip, NY

\*      \*      \*

Plaintiffs are represented by Juno Turner, Justin Mitchell Swartz, Michael Joseph Scimone, Ossai Miazad, and Sally J. Abrahamson of Outten & Golden LLP, 3 Park Avenue, 29th Floor, New York, NY 10016. Defendant is represented by Hema Chatlani, John T. Anthony, and Robert Steven Whitman of Seyfarth Shaw LLP, 620 Eighth Avenue, New York, NY 10018.